**MONTANA CHAMBER OF COMMERCE, Sletten Construction Company, Lehrkind's, Inc., Kalispell Area Chamber of Commerce, Montana Hospital Association, Montana Farm Bureau Federation, Montana Education Association, Plaintiffs,**

v.

**Ed ARGENBRIGHT, in his official capacity as Commissioner of Political Practices, Defendant,**

and

**I–125 Proponents' Committee, Defendant–Intervenor.**

**Montana Mining Association, Northwest Mining Association, Communities for a Great Northwest, Golden Sunlight Mines, Inc., Yellow Band Gold, Inc. and Continental Lime, Inc., Plaintiffs,**

v.

**Ed Argenbright, in his official capacity as Commissioner of Political Practices, and Mike Cooney, in his official capacity as Montana Secretary of State, Defendants,**

and

**I–125 Proponents' Committee, Defendant–Intervenor.**

Nos. CV 97–6–H–CCL, CV 98–37–H–CCL.

United States District Court,
D. Montana,
Helena Division.

Nov. 20, 1998.

Stanley T. Kaleczyc, Kimberly A. Beatty, Browning, Kakeczyc, Berry & Hoven, PC, Helena, MT, Page C. Dringman, Josephson & Fredricks, Big Timber, MT, Stephen A. Bokat, Robin S. Conrad, Nat. Chamber Litigation Center, Inc., Washington, DC, for Plaintiffs.

James M. Scheier, W.D. Hutchison, Office of the Montana Atty. Gen., Helena, MT, for Defendant.

Jonathan R. Motl, Reynolds, Motl and Sherwood, Helena, MT, John C. Bonifaz, Brenda Wright, Nat. Voting Rights Institute, Boston, MA, for League of Women Voters of Montana.

## OPINION and ORDER

LOVELL, District Judge.

These two cases (hereinafter *Montana Chamber* and *Montana Mining Ass'n,* respectively) seek declaratory judgments and injunctive relief invalidating Initiative 125, and the *Montana Mining Ass'n* suit seeks similar relief as to Initiative 137. The court granted limited consolidation of the two cases by setting down serial trials with both cases to be tried before the court decided either, and with all agreeing that all evidence in the *Montana Chamber* case was also before the court in the *Montana Mining Ass'n* case. The cases came on regularly for trial on the merits on October 13 and October 21, 1998, respectively. In the case of *Montana Mining Ass'n,* a hearing on Plaintiffs' motions for preliminary injunction was merged with the trial.

The court has jurisdiction over both cases pursuant to 28 U.S.C. § 1331 (federal question). Having shown an invasion of a legally protected interest, a causal connection between the injury and the matter complained of, and a likelihood that the injury can be redressed by a favorable decision, *see Lee v. State of Oregon,* 107 F.3d 1382, 1387 (9th Cir.1997), the Plaintiffs in both cases (with one exception) have standing to litigate their complaints. All parties in the *Montana Chamber* case agree that Plaintiff Montana Education Association ("MEA") no longer has standing and ought to be dismissed from the case because the MEA has disincorporated to avoid the restrictions imposed by Initiative 125.

After receiving the evidence in both trials and after considering the arguments of all the parties, the court ruled from the bench on October 22, 1998, finding in favor of the Plaintiffs in both cases as to the unconstitutionality of I–125 but denying the injunction against I–137 sought by the Plaintiffs in the *Montana Mining Ass'n* case. The following opinion explains the court's reasoning and also shall stand for the court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

*Background*

Since 1975, a total prohibition against all corporate contributions or payments to Montana ballot elections has been considered to be an overbroad, blanket infringement of corporations' First Amendment rights. *C & C Plywood Corp. v. Hanson,* 420 F.Supp. 1254 (D.Mont.1976), *aff'd* 583 F.2d 421 (9th Cir.

1978). In *C & C Plywood*, the circuit panel began its review with the fundamental proposition that political speech is "at the heart of the First Amendment's protection." *Id.* at 423 (*quoting First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978)). In affirming the district court's decision, the circuit panel also relied upon *Bellotti* for the rule that corporate speech is protected by the First Amendment unless a compelling state interest can be shown that justifies the abridgment. *Id.* at 423–25. The panel noted that corruption is not an issue in nonpartisan ballot issue elections (at least in the sense of *quid pro quo* corruption, which is generally defined as an attempt to buy political favors from candidates by individuals or corporations). *Id.* at 425. Thus, from 1975 until 1996 Montana corporations have been permitted to make contributions and expenditures to support or oppose ballot issues in Montana.

In 1996, however, Montana voters approved Initiative 125 ("I–125"), which amends Mont.Code Ann. § 13–35–227 and provides as follows:

(1) (a) Except as provided in subsection (4), a corporation may not make a contribution or an expenditure in connection with a . . . ballot issue, or a political committee which supports or opposes a . . . ballot issue.

(b) For purposes of this section, "corporation" refers to for-profit and nonprofit corporations.

. . .

(4) The provisions of subsection (1) prohibiting corporate contributions to or expenditures in connection with a ballot issue do not apply to a nonprofit corporation formed for the purpose, among others, of promoting political ideas, and that:

(a) does not engage in business activities;

(b) has no shareholders or other affiliated persons who have a private claim on the corporation's assets or earnings;

(c) does not accept foreign or domestic for-profit corporations as members; and

(d) does not accept in the aggregate more than 5% annually of its total revenue from foreign or domestic for-profit corporations.

The codification of I–125 was itself amended by the 55th Legislature by means of House Bill 575, effective April 17, 1997, which amendment deleted the exception regarding nonprofits (§ 13–35–227(4)) and expanded the class of entities affected by I–125 from corporations to include partnerships, associations, cooperatives, and other organizations. *See* Mont.Code Ann. § 13–35–236 (1997). On February 18, 1998, this court granted the *Montana Chamber* Plaintiff's summary judgment motion as to Count VI of their Amended Complaint, and in so doing declared that H.B. 575 was an unconstitutional and unenforceable abridgement of Plaintiffs' First Amendment freedoms of speech and association. This partial summary judgment decision left open the question whether I–125 itself violates the First Amendment and is therefore unconstitutional and unenforceable. This issue was set for trial to allow Plaintiffs to present their case and particularly to permit Defendants to present evidence to support their contentions that a compelling state interest justifies the speech restrictions imposed by I–125.

*Evidence at Trial*

Plaintiffs presented documentary evidence and witnesses, including Robert Brown, Robert Gannon, David Owen, Eric Feaver, Jerome Anderson, James Lopach, Herbert Alexander, Ed Argenbright, and Robert Moore.

Sen. Bob Brown, director of the campaign committee supporting Referendum 113, the Six Mills Levy University Funding Initiative, testified extensively regarding the manner in which I–125 hampered his ability to raise funds for R–113. Sen. Brown testified that many corporations, both for-profits and non-profits, were not contributing to this initiative campaign as they had in the past because of fear of running afoul of I–125, and that as a result the campaign committee lacked funds with which to educate Montanans about R–113.

Robert Gannon, Chairman of the Board, CEO, and President of Montana Power Company ("MPC"), testified persuasively regarding the inability of MPC to utilize its employ-

ee political action committee (the "MPC PAC") to respond to ballot initiatives that might threaten MPC's economic interests. Although no such ballot initiatives were qualified for the 1998 election cycle, three petitions were circulated that would have had major effects upon MPC's electric restructuring process. Mr. Gannon explained that little time is available to respond to a ballot initiative question, that he is the ultimate decision-maker regarding MPC's ballot initiative strategy, and that large amounts of money could be required to mount effective campaigns against ballot initiatives threatening MPC's interests. The MPC PAC is not an effective vehicle for this purpose, for the MPC PAC collects only about $15,000 in funds each year (which funds are distributed to legislative candidates). The MPC PAC is controlled by a diverse committee of employees, and it therefore cannot make campaign strategy decisions as quickly as can a single individual such as the CEO of MPC. The MPC PAC therefore expresses the political positions of the employees who contribute to it; the MPC PAC does not, is not designed to, and really cannot express the political positions of MPC itself. (About half of MPC's shareholders are corporations who likewise are prohibited under I–125 according to Mr. Gannon.)

Mr. Gannon also testified that because of I–125 he was uncomfortable expressing his personal opinions in any public forum regarding a ballot issue such as R–113. Such public expressions of private sentiments might be misconstrued as a forbidden corporate in-kind contribution to the R–113 ballot issue campaign because, as President of MPC, Mr. Gannon is widely viewed as MPC's spokesperson, and he is compensated by MPC to express its views. Thus, Mr. Gannon's personal speech has been chilled in the context of ballot issue debates due to I–125.

David Owen, President of the Montana Chamber of Commerce, testified that his ability to perform his political duties as Chamber president has been all but extinguished. Most of the Montana Chamber of Commerce members are corporations; therefore a Chamber PAC would not be an effective vehicle to raise and manage ballot issue contributions and expenditures because the corporate Chamber members would be prevented from contributing to the PAC by I–125. Mr. Owen testified that he cannot travel around the state and speak to the membership of service clubs regarding ballot issues because these audiences contain non-Chamber of Commerce members, making such travel and speaking arrangements a prohibited in-kind contribution to a ballot issue campaign. Neither can Mr. Owen be interviewed or participate in radio or television debates on ballot issues. Neither can Mr. Owen write editorials to express the political views of the Montana Chamber of Commerce regarding ballot issues, much less organize campaigns and coalitions to promote or fight ballot issues. The Montana Chamber is even reluctant to take official positions in its own newsletter for fear of communicating with non-members in violation of I–125. Like Mr. Gannon, Mr. Owen testified that his personal political speech about ballot issues has been chilled due to his concern that his speech might be attributed to the Chamber of Commerce, for which he is obviously a spokesperson.

Eric Feaver, the President of the Montana Education Association ("MEA"), testified that the MEA relinquished its incorporated status in order to fight Constitutional Initiative 75 ("CI–75"), a ballot issue calling for a requirement that all taxes be put to a popular vote. Although the primary function of the MEA is to organize collective bargaining for its 10,000 members, the MEA also markets insurance and health care to its members, as well as conducting other miscellaneous business enterprises. In addition to its primary advocacy, the MEA engages in legislative lobbying and ballot issues campaigning. Although the MEA has created a PAC fund for ballot issues, and through that fund the MEA has raised over $30,000 for ballot issue campaigns, Mr. Feaver testified that the MEA was unable to raise through its PAC the amount of money it requires to fight CI–75. Because I–125 would have stifled MEA's right to political speech its corporate entity was dissolved to escape the prohibition.

Jerome Anderson, opposition campaign director for I–115 in 1990 and I–122 in 1996, testified that he does not believe that sheer dollars are the ultimate factor in an opposition campaign. Instead, Mr. Anderson believes that the defeat of other initiatives (I–115 and I–122) depended upon the development of credible, persuasive messages which were consistent with the values of a majority of voters. Mr. Anderson testified that I–125 has curtailed the free flow of information in ballot issue campaigns. As an example, he asserted that technical reports obtained from corporations for use as campaign literature in the I–122 opposition campaign could not be used after the passage of I–125 because they would be prohibited in-kind contributions to a ballot issue campaign. Mr. Anderson also noted that this was the quietest general election campaign season he can recall observing.

The testimony of Dr. James Lopach, professor of political science at the University of Montana, was particularly enlightening. Dr. Lopach has extensively studied Montana politics, electoral politics, voting behavior, and ballot elections. Dr. Lopach's expert opinion is that there is no corruption in the Montana political system. Not only is Dr. Lopach unaware of any actual corruption in Montana politics, but also he is unaware of any issue giving rise to the appearance of corruption in the eyes of the voters.

Dr. Lopach testified that Montana's political process is very healthy in that there is a proper degree of party competition, high voter turnouts, and low voter fall-off on the ballot. Montana's voter turnout is approximately 15% higher than the national average. Voter falloff, which is defined as the failure of voters to vote from the top to the bottom of the ballot, is quite low, and in some instances voters have had a higher participation in ballot issues (at the bottom of the ballot) than in major candidate races, as in 1996 when 97.3% of the voters participated in the I–122 ballot but 97.1% of the voters participated in the governor's race.

Dr. Lopach testified that money is not the principal determinant of ballot issue campaigns. Dr. Lopach's opinion is that I–125 has had the negative effect of cutting off meaningful political speech. Although money is one factor influencing ballot issue campaigns, and media advertising is another, Dr. Lopach believes that political predisposition is primarily responsible for voting behavior. Thus, there is no credible evidence that corporate money is dominating citizen voices to the detriment of Montana's ballot initiative political process.

Dr. Lopach's testimony was echoed by Dr. Herbert Alexander, former director of the Citizens Research Foundation and professor emeritus of political science at the University of California, Berkeley. Dr. Alexander testified that neither money nor media advertising is the principal determinant of outcome in ballot issue elections. Dr. Alexander believes that Initiative 125 makes bad public policy because it removes a significant voice (i.e., that of corporations) which should be heard during ballot issue campaigns.

Secretary of State Mike Cooney, the State of Montana's Chief Election Officer, testified that there is no evidence of corruption in Montana politics in the form of buying or selling votes or tampering with election results. There is no evidence that corporate contributions or expenditures made in connection with ballot issues have reduced voter turnout or caused voter falloff on the ballot. Instead, the ballot issues in which the most money has been expended generally have had the highest voter participation.

Defendants likewise presented documentary evidence and witnesses, including Ed Argenbright, Joseph Kerwin, Dulcy Hubbert, Robert Shepard, Dennis Alexander, C.B. Pearson, Tony Jewett, Stan Frasier, John Deardourff, Mike Cooney, Samantha Sanchez, and William Chaloupka.

Dr. Robert Shepard, a Helena physician who was one of the proponents of Initiative 115, testified regarding the difficulties the I–115 citizens' group faced in communicating their message regarding the I–115 tobacco tax. There is no doubt that Dr. Shepard was thoroughly disenchanted by the experience of campaigning against the campaign machine funded by out-of-state tobacco companies. Regrettably, Dr. Shepard testified that he will not work for another ballot issue cam-

paign as a result of his experience with I–115. On cross-examination, Plaintiffs questioned Dr. Shepard whether proponents' failure to convince the voters to support I–115 might have been due in part to proponents' mistakes, questioning whether proponents' strategy might have been poorly planned, whether proponents' political experience was insubstantial, and whether proponents' fundraising techniques might have been inadequate.

The court also received testimony from Tony Jewett, executive director of the Montana Wildlife Federation, who testified regarding his experience in 1980 as a proponent of Initiative 87, a recycling initiative, and his involvement in Initiative 122, a clean water initiative. Mr. Jewett testified to feeling discouraged by his experiences with I–87 and I–122 because citizen proponents could not raise comparable funds to purchase media advertising as could their corporate opponents. Likewise, Mr. Stan Frasier testified to his experience as the Helena area captain of Initiative 122. From that experience, Mr. Frasier feels that citizens cannot win against corporate money in ballot issue campaigns.

John Deardourff testified regarding a survey taken by his polling firm which indicates that Montana citizens are displeased generally because of their perception of excessive corporate spending during ballot issue campaigns.

On direct examination by Defendant–Intervenor, Secretary of State Mike Cooney testified that he believes that corporate dollars are corrupting Montana's ballot initiatives and causing people to walk away from that political process. Secretary Cooney testified that I–125 brings reasonable limits to excessive spending, levels the playing field for citizens and corporations, and promotes an equal amount of communication from both sides. However, when questioned by Plaintiffs' counsel, Secretary Cooney acknowledged that voter statistics do not show that Montanans are turning away from the ballot initiative process or elections in general.

Ms. Samantha Sanchez is the executive director of the National Institute on Money in State Politics. Ms. Sanchez claims to be an expert in the area of campaign contribu-tions, and she studies the comparative ratios of campaign contributions by analyzing contribution patterns, source, and quantity. Ms. Sanchez testified regarding contributions from out-of-state corporations in certain ballot issue elections compared to overall contributions and expenditures and compared to contributions and expenditures in other statewide and local elections.

Dr. William Chaloupka opined that (expensive) repetitive media advertising works and that political campaigns rely upon rhetoric and imagery, communicated by various media, to persuade voters to adopt a particular point of view. Dr. Chaloupka, a professor of political science at the University of Montana, has not specialized in the area of Montana ballot initiatives.

The court also received testimony from witness C.B. Pearson, a former executive director of Common Cause of Montana, and the campaign manager for Initiatives 114, 118, and 125. Mr. Pearson is quite familiar with Montana's ballot initiative process, having personally participated in that process and having authored a monograph on the subject, "Big Money in Montana Ballot Campaigns (1982–1994)."

Mr. Pearson testified that he believes that the domination of corporate dollars is an abuse of the ballot initiative process and that corporate money discourages citizens from proposing ballot issues. Specifically, Mr. Pearson testified that his analysis of Montana ballot issue elections shows that in nine initiatives wherein proponents were outspent by a 2/3 margin, seven of the nine initiatives (77%) were defeated. On cross-examination, Plaintiffs showed that when all ballot initiatives are considered wherein one side outspent the other side by a 2/3 margin, the side outspending won ten times and lost nine times.

*Discussion*

Having considered all the evidence submitted by the parties, the court finds Plaintiffs' evidence to be credible and persuasive. The court accepts the expert testimony provided by Dr. Lopach, who asserted there is no corruption or appearance of corruption in Montana ballot issue elections and that this

Montana political process is healthy and of sound integrity. The court accepts the testimony of both Drs. Lopach and Alexander that many factors influence election outcome, particularly the political values, predispositions, and party loyalty of the voters, and that neither money nor media advertising is the sole or even the single most important variable controlling election outcomes. The court accepts the testimony of Plaintiffs' witnesses that Initiative 125 deprives corporations of the ability to communicate their political views during ballot issue campaigns.

The court finds the defense witnesses who testified regarding their participation in ballot issue campaigns to be sincerely motivated and public-spirited persons. Some of these witnesses appear to have had unfortunate experiences by being involved in issue campaigns in which their sides lost and the other side had a disproportionate amount of funds. Apparently these witnesses have made the leap in logic that they lost solely because of the opposing side's funds, which the court considers to be an unwarranted but all too human conclusion. The collective sincerity of these witnesses inclines the court to a sympathetic view of their testimony, but they simply have not proven their contention by a preponderance of the evidence.

Of course money can and does have a potential effect on the outcome of elections. It is one of many factors. Multiple variables other than money and media influence election outcomes. Montana ballot issue elections are not corrupted by the political expressions of corporations. The ballot issue process in Montana is healthy and not corrupt. Montana has no compelling state interest which would justify the abridgment of First Amendment rights imposed by Initiative 125.

■ The court concludes first and foremost, that Initiative 125, perhaps facially and certainly as applied, infringes upon the First Amendment rights of speech and association of the Plaintiffs and others subject to the prohibitions contained therein. Initiative 125 is not narrowly tailored to address only the campaign contributions and expenditures of large corporations. The reported aim of its drafters was to catch the big fish—shut off the large campaign warchests. But the net cast by Initiative 125 arguably also catches tens of thousands of little fish, individual Montanans who have banded together to enhance their political speech through organizations such as the Montana Education Association, the Montana Stockgrowers Association, the Montana Wool Growers Association, the Montana Chamber of Commerce, the Montana Farm Bureau, the Montana Hospital Association, the Montana Medical Association, the Montana Taxpayers' Association, and others.

■ "A major purpose of [the First] Amendment [is] to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966). The First Amendment therefore protects political expression, and in so doing "serves significant societal interests" and "often protects interests broader than those of the party seeking their vindication...." *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 766, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). Thus, the proper question is whether a particular type of expression deserves First Amendment protection. *Id.*

Requiring corporations to fund ballot issue campaign speech through separate, segregated funds (consisting of voluntary contributions from employees, officers, directors, and shareholders), as is required by Initiative 125, deprives corporations of their ability to communicate political ideas directly to the electorate. The corporate voice is silenced. Initiative 125 chills impermissibly the speech and association rights of corporations and their officers and employees. Initiative 125 precludes corporations from directly resisting potential laws that could put them out of business. Requiring shareholders to fight the corporation's battles is an ineffective and illegal substitution for corporate speech rights. Perhaps almost as important, Initiative 125 prevents the electorate from being exposed to diverse viewpoints on public policy issues.

The State of Montana, which is represented by Defendant and Defendant–Intervenor, must show a compelling state interest to

justify a significant infringement of core First Amendment rights. *Colorado Repub. Campaign Comm. v. Federal Election Comm'n,* 518 U.S. 604, 609, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996). Leveling the playing field by equalizing the strength of citizen speech relative to corporate speech is inconsistent with First Amendment purposes and principles. *Buckley v. Valeo,* 424 U.S. 1, 48–49, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). To accomplish the necessary showing, the State must demonstrate the existence or appearance of corruption, which the court defines to include real harm to the integrity of Montana's ballot initiative process. Real harm does not include "wasteful and excessive campaign spending." *Colorado Republican Federal Campaign Committee,* 518 U.S. at 617, 116 S.Ct. 2309. While it may be conceivable that corporations could overwhelm the political speech of individual citizens in a particular case to such a degree that the integrity of the ballot initiative process itself is damaged, *see Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 661, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), the meager anecdotal evidence presented by the Defendants wholly fails to prove that such has occurred in Montana. The State has failed to show that corporate contributions or expenditures in ballot initiative campaigns have had any adverse effect on the integrity of Montana's political process. Specifically, the State has failed to produce evidence that would support a judicial finding that corporate wealth has dominated citizen voices to the detriment of the ballot initiative process.

Corporations are therefore entitled to defend their economic interests by resorting to the corporate treasury to fund their participation in ballot initiative campaigns. Like individuals, unions, and associations, corporations are entitled to attempt to shift public opinion and voting behavior to favor the corporate point of view, and in fact this is the primary purpose of all political speech, *see Bellotti,* 435 U.S. at 790, 98 S.Ct. 1407. It is up to the voters to determine whether they approve or disapprove of a corporation's point of view. The purpose of the First Amendment is to allow "each person [to] decide for him or herself the ideas and beliefs deserving of expression, consideration

and adherence." *Turner Broadcasting System, Inc. v. Federal Communications Commission,* 512 U.S. 622, 641, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994).

The popular sentiment among Montana voters may be that there is too much corporate money influencing ballot issue campaigns and also that it is exceedingly difficult for ordinary citizens to participate successfully in some ballot issue campaigns. However, the law of the United States is that political speech is protected by the First Amendment, and this rule of law benefits all Montanans. The court is sensitive to the complaint that I–125 represents the will of the people. As a matter of law, however, it is simply not relevant that Initiative 125 was enacted by the voters rather than the legislature, "because the voters may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation." *Citizens Against Rent Control v. Berkeley,* 454 U.S. 290, 295, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981).

In order to promote open and informed discussion of public affairs, the First Amendment seeks to "protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). Under the law of the United States, that protection is granted to political speech without regard to its source, whether individual, corporation, union, or other association. Freedom of speech regarding public affairs is one of the cornerstones of self-government. "And self-government suffers when those in power suppress competing views on public issues 'from diverse and antagonistic sources.'" *New York Times Co. v. Sullivan,* 376 U.S. 254, 266, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (*quoting Associated Press v. United States,* 326 U.S. 1, 20, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945)).

Accordingly,

IT IS HEREBY DECLARED that Initiative 125 is unconstitutional and therefore null and void, with no legal force or effect. The State of Montana is directed to cease its enforcement of the provisions of Initiative

125. Judgment shall be entered in Plaintiffs' favor in both *Montana Chamber* and *Montana Mining Ass'n,* although in the latter case the court denies the Plaintiffs' preliminary injunction motion as to Initiative 137 because the relief sought was premature as of the close of evidence.

Each party shall bear its own fees and costs.

IT IS FURTHER ORDERED that the complaint in *Montana Chamber* is DISMISSED as to Montana Education Association for its lack of standing to sue.

The Clerk is directed forthwith to notify the parties of entry of this order.