10-1535-cv
Sheet Metal Workers Local No. 33 et al. v. CBRE Realty Fin., Inc. et al.

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2010

(Argued: June 1, 2011     Decided: July 26, 2011)

Docket No. 10-1535-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - -x

PHILIP HUTCHISON, Individually and On Behalf of
All Others Similarly Situated,

Plaintiff,

SHEET METAL WORKERS LOCAL NO. 33, Lead Plaintiff,
ALFRED IVERS, Lead Plaintiff, WEST PALM BEACH
FIREFIGHTERS PENSION FUND,

Plaintiffs-Appellants,

-v.-

DEUTSCHE BANK SECURITIES INC., CITIGROUP GLOBAL
MARKETS INC., WACHOVIA CAPITAL MARKETS, LLC,
JMP SECURITIES LLC, CREDIT SUISSE SECURITIES
(USA) LLC,

Defendants,

CBRE REALTY FINANCE, INC., KEITH GOLLENBERG,
MICHAEL ANGERTHAL, RAY WIRTA,

Defendants-Appellees.

- - - - - - - - - - - - - - - - - - - - - - - - - - -x

Before: JACOBS, Chief Judge, LIVINGSTON, Circuit Judge, and RAKOFF,* District Judge.

Plaintiffs-Appellants Sheet Metal Workers Local 33 et al. appeal from an August 11, 2009 judgment of the United States District Court for the District of Connecticut (Underhill, J.), dismissing their putative securities class action complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The complaint alleged that the securities issuer made false statements and omissions of material facts in the registration documents accompanying its initial public offering, in violation of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933. We conclude that the alleged misstatements were not material because the value of the transactions composed an immaterial portion of the issuer's total assets. Affirmed.

SUSAN K. ALEXANDER (Sanford Svetcov, San Francisco, CA and Samuel H. Rudman, David A. Rosenfeld, and Evan J. Kaufman, New York, NY, on the briefs), Robbins Geller Rudman & Dowd LLP, San Francisco, CA, for Plaintiffs-Appellants.

ROBERT S. FISCHLER (Justin J. Wolosz and David T. Cohen, on the brief), Ropes & Gray LLP, New York, NY, for Defendants-Appellees.

_____

* The Honorable Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

DENNIS JACOBS, Chief Judge:

Defendant-Appellee CBRE Realty Finance, Inc. ("CBRE"), a real estate financing company, floated its initial public offering (the "IPO") in September 2006. Among the purchasers were Plaintiffs-Appellants Sheet Metal Workers Local No. 33 and other plaintiffs (collectively, "Plaintiffs") in this action. They appeal from an August 11, 2009 judgment of the United States District Court for the District of Connecticut (Underhill, J.), granting a Fed. R. Civ. P. 12(b)(6) motion to dismiss their putative securities class action complaint for failure to state a claim. Plaintiffs alleged that CBRE and its Chief Executive Officer Keith Gollenberg, Chief Financial Officer Michael Angerthal, and Chairman of the Board Ray Wirta (the "Defendants") made false statements and omissions of material facts in the registration statement and prospectus, concerning the impairment of two mezzanine loans. The district court granted CBRE's motion to dismiss on the ground of immateriality, because the loans were fully collateralized at the time of the IPO. See Hutchison v. CBRE Realty Fin., Inc., 638 F. Supp. 2d 265, 276 (D. Conn. 2009) ("Hutchison I"). A motion to replead was denied. We affirm, albeit on somewhat different grounds.

**BACKGROUND**

Since this is an appeal from a Fed. R. Civ. P. 12(b)(6) dismissal, the following facts are drawn from Plaintiffs' Second Amended Class Action Complaint for Violations of Federal Securities Laws (the "Second Amended Complaint"), and are accepted as true.  See Slayton v. Am. Express Co., 604 F.3d 758, 766 (2d Cir. 2010).  We also rely on information derived from CBRE's filings with the Securities and Exchange Commission ("SEC") and other documents that are invoked by the complaint.  See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) ("[W]e may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.").

CBRE is a commercial real estate speciality finance company focused on originating, acquiring, investing, financing, and managing commercial real estate-related loans and securities.  Its investment portfolio consists of: whole loans; subordinated interests in first mortgage real estate

4

loans; real estate-related mezzanine loans; commercial mortgage-backed securities; and joint venture investments.

On September 26, 2006, CBRE filed an SEC Form S-11/A Registration Statement (the "Registration Statement") for its IPO. The Registration Statement offered 9,600,000 common shares to the public at $14.50 per share. The underwriters were granted an option to purchase up to an additional 1,440,000 common shares at $14.50 per share. The SEC declared the prospectus effective on September 27, 2006. The IPO raised approximately $144 million.

At the time of the IPO, two mezzanine loans were outstanding to developer Triton Real Estate Partners, LLC ("Triton"). As defined in CBRE's prospectus, investments in mezzanine loans "take the form of subordinated loans secured by second mortgages on the underlying property or loans secured by a pledge of the ownership interests in the entity that directly or indirectly owns the property." The first loan, with a carrying value of $19.7 million, was made on or about October 31, 2005 and was collateralized by The Rodgers Forge, a 508-unit condominium conversion project in North Bethesda, Maryland (the "Rodgers Forge Loan"). The second loan, with a carrying value of $31.8 million, was made on or

about November 8, 2005 and was collateralized by The Monterey, a 434-unit condominium conversion project in Rockville, Maryland (the "Monterey Loan," and together with the Rodgers Forge Loan, the "Triton Loans").

The Second Amended Complaint alleges that Defendants knew that these mezzanine loans were in trouble at the time of the IPO. Triton had missed tax payments on both The Rodgers Forge and The Monterey, sales were declining at both condominiums, and The Monterey development was over budget.[1] CBRE had entered into an Intercreditor Agreement in or around November 2005 with Freemont Investment and Loan ("Freemont"), the senior lender on the Monterey Loan. Under that agreement, CBRE and Freemont were required to keep each other apprised of any developments with respect to The Monterey, including whether the project was experiencing any financial difficulties. According to a former regional manager at Freemont, Triton had exceeded the construction budget for The Monterey by approximately $3-$5 million by the summer of 2006, and as a result of this "out-of-balance" condition, Freemont stopped funding its senior loan on

---

[1] For this allegation, Plaintiffs relied on information from a confidential witness who had been a CBRE underwriter/financial analyst, and worked at CBRE from June 2005 to June 2007.

several occasions.  During the summer of 2006, Freemont discussed the "out-of-balance" condition with Triton; pursuant to the Intercreditor Agreement, Freemont would also have been required to inform CBRE.

Other allegations concerning Triton's troubles include: cost overruns due to unforeseen asbestos removal and unexpected mechanical and electrical issues at The Monterey; mechanics liens filed against both projects, claiming non-payment of contractors in mid-2006; Triton's solicitation of additional funding from equity investors; and Triton's default on payments to sub-contractors, which caused the sub-contractors to halt construction on both projects.

The Second Amended Complaint alleges that CBRE's Registration Statement was materially inaccurate because it failed to disclose that the Triton Loans were "impaired" (a defined term[2]).  The Registration Statement reported that

---

[2] The Registration Statement defined "impairment" as follows:

> Loans and other investments are considered to be impaired, for financial reporting purposes, when it is deemed probable that the Company will be unable to collect all amounts due according to the contractual terms of the original agreements, or, for loans purchased at a discount for credit quality, when the Company determines that it is probable that it will be unable to collect as anticipated.

CBRE had reviewed its portfolio of loans and did not "identify any loans that exhibit[ed] characteristics indicating that impairment ha[d] occurred."

On February 26, 2007, five months after the IPO, CBRE "announc[ed] its financial results for the fourth quarter [of 2006]." The press release indicated that as of December 31, 2006 CBRE had classified the Monterey Loan as "non-performing" and that the Rodgers Forge Loan was on CBRE's "watch list," but that CBRE "had no impairments or loss reserves since inception." ("Non-performing" and "watch list" are defined in the margin.[3]) Following the press release, CBRE's common stock price dropped more than 18% over the two-day period ending February 28, 2007.

CBRE reported more bad news in the following months.

---

[3] CBRE defined "non-performing" as:

(1) management determines the borrower is incapable of curing, or has ceased efforts towards curing the cause of a default; (2) the loan becomes 90 days delinquent; (3) the loan has a maturity default; or (4) the net realizable value of the loan's underlying collateral approximates our carrying value of such loan.

CBRE defined "watch list" as:

[A] review . . . designed to enable management to evaluate and proactively manage asset-specific credit issues and identify credit trends on a portfolio-wide basis as an "early warning system."

8

Its year-end 2006 Form 10-K (filed on or about March 26, 2007) reported that CBRE had advanced approximately $1.7 million to protect its mezzanine loan position in The Rodgers Forge. A May 7, 2007 press release disclosed that, as of April 25, 2007, CBRE was no longer pursuing equity real estate investments through joint ventures, and that on May 4, 2007, CBRE foreclosed on the Rodgers Forge Loan. On May 9, 2007, CBRE foreclosed on the Monterey Loan. CBRE wrote down the value of both loans, and incurred a $7.8 million impairment charge with regard to the write-down of the Monterey Loan.

On January 15, 2009, Defendants moved to dismiss the Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6), arguing that the Second Amended Complaint failed to plausibly allege that the prospectus contained a material misstatement or omission. On July 29, 2009, the district court issued an order dismissing the Second Amended Complaint for failure to state a claim. Judgment was entered on August 11, 2009, dismissing the action and closing the file.

The district court held that Plaintiffs did not plausibly allege that the omissions concerning the Triton

9

Loans were material because, as reflected in CBRE's SEC filings, the Triton Loans were fully collateralized by the underlying real estate. Therefore, the district court reasoned, "CBRE was not at risk" of a material loss on the loans "at the time that the registration statement and prospectus issued." Hutchison I, 638 F. Supp. 2d at 275. The district court did not "rely on any quantitative benchmarks to assess the materiality of the alleged omissions at issue in this case." Id. at 277.

After the dismissal, Plaintiffs moved for reconsideration or, in the alternative, for leave to file a Proposed Third Amended Complaint. The motion was denied. The district court found that Plaintiffs were attempting to relitigate the issue of materiality, and that the allegations they claimed had been overlooked had in fact been considered. Hutchison v. CBRE Realty Fin., Inc., No. 07-cv-1599, 2010 WL 1257495, at *2 (D. Conn. Mar. 25, 2010) ("Hutchison II"). In denying Plaintiffs' request for leave to file a Proposed Third Amended Complaint, the district court held that the proposed pleading added no relevant factual allegations and would have been futile. Id. at *3. Specifically, the district court noted that "[b]ecause the

10

Triton Loans were adequately collateralized at the time of the IPO, there existed no risk of a loss to CBRE at that time. The facts as pled in the Proposed Third Amended Complaint fail once again to rectify the deficiencies concerning the materiality of the omissions." Id. As a separate ground for denying leave to amend, the court ruled that Plaintiffs had inordinately delayed seeking leave to amend (for a third time) by waiting until after the entry of judgment dismissing the Second Amended Complaint, nearly two years after the litigation began. Id. at *4.

## DISCUSSION

"We review de novo the dismissal of a complaint under Rule 12(b)(6), accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009). "Where, as here, dismissed claims arise under § 11, we conduct a 'preliminary inquiry' into whether [P]laintiffs' allegations are premised on fraud so as to require satisfaction of the heightened pleading standards of Fed. R. Civ. P. 9(b)." In re Lehman Bros. Mortg.-Backed

11

Sec. Litig., --- F.3d ---, 2011 WL 1778726, at *4 (2d Cir. May 11, 2011) (quoting In re Morgan Stanley Info. Fund Sec. Litig., 592 F3d 347, 358 (2d Cir. 2010)).  We will not, however, apply the heightened pleading standard of Rule 9(b) where the complaint sounds in negligence, rather than fraud.  See, e.g., Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 715 (2d Cir. 2011).  Here, Plaintiffs "expressly disclaim[] any allegation of fraud . . . and [D]efendants do not contend otherwise."  In re Lehman Bros., 2011 WL 1778726, at *4.  "Accordingly, we review the complaint['s] sufficiency under the notice-pleading standard, which requires [P]laintiffs to assert enough facts to state a claim to relief that is plausible on its face."  Id. (internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. ----, 129 S. Ct. 1937, 1949 (2009).

**I.**

**A.**

Section 11 of the Securities Act provides a private right of action to a person who purchased a security, either directly from the issuer or in the aftermarket, if the

12

registration statement filed with the SEC contained either misstatements or omissions of material facts.  See 15 U.S.C. § 77k(a).  Similarly, Section 12(a)(2) imposes liability on the issuer or seller of securities if the securities were sold using a prospectus that contained a material misstatement or omission.  See id. § 77l(a)(2).  "So long as a plaintiff establishes one of the three bases for liability under these provisions--(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading, see In re Morgan Stanley, 592 F.3d at 360--then, in a Section 11 case, 'the general rule [is] that an issuer's liability . . . is absolute.'" Blackstone, 634 F.3d at 715-16 (quoting In re Initial Pub. Offering Sec. Litig., 483 F.3d 70, 73 n.1 (2d Cir. 2007)). Section 15 creates liability for individuals or entities that "control[] any person liable" under Sections 11 or 12. 15 U.S.C. § 77o(a).

"Issuers are subject to 'virtually absolute' liability under section 11," In re Morgan Stanley, 592 F.3d at 359 (quoting Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983)), and plaintiffs alleging violations of Sections 11

13

and 12(a)(2) not need plead "scienter, reliance, or loss causation," id. (citing Rombach v. Chang, 355 F.3d 164, 169 n.4 (2d Cir. 2004)).

Plaintiffs principally cite Item 303 of Regulation S-K, 17 C.F.R. § 229.303, as the disclosure obligation that was breached.[4]  Item 303 requires that a registrant "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii). "The SEC's interpretive release regarding Item 303 clarifies that the Regulation imposes a disclosure duty 'where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial

_____

[4] Plaintiffs assert that Defendants also breached a disclosure obligation created by Item 503 of Regulation S-K, 17 C.F.R. § 229.503.  Item 503 requires that a registrant "[w]here appropriate, provide . . . a discussion of the most significant factors that make the offering speculative or risky."  Id. § 229.503(c).  On appeal, Plaintiffs advance no arguments unique to Item 503, focusing instead primarily on Defendants' disclosure obligations under Item 303. Moreover, to the extent we conclude that the impairment of the Triton Loans and Triton's financial difficulties prior to the IPO did not constitute facts "reasonably likely" to be material under Item 303, see Blackstone, 634 F.3d at 716, we similarly conclude that they were not among "the most significant factors" rendering CBRE's IPO "speculative or risky," 17 C.F.R. § 229.503(c).

14

condition or results of operations.'" Blackstone, 634 F.3d at 716 (quoting Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989)).

**B.**

The Triton Loans were $51.5 million out of a total investment portfolio of more than $1.1 billion; but, as Plaintiffs emphasize, the Triton Loans made up a much larger proportion--approximately 25%--of CBRE's mezzanine loan portfolio.

To determine whether a misstatement or omission is material is an "inherently fact-specific" inquiry. Basic v. Levinson, 485 U.S. 224, 236 (1988). A fact "'is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act].'" Id. at 231 (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). That is to say "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Indus., Inc., 426 U.S. at 449.

15

"[W]e have consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation." Ganino v. Citizens Utils. Co., 228 F.3d 154, 162 (2d Cir. 2000). "In both Ganino and [JP Morgan], we cited with approval SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150 (1999) . . . , which provides relevant guidance regarding the proper assessment of materiality." Blackstone, 634 F.3d at 717. According to SEC Staff Accounting Bulletin No. 99 ("SAB No. 99"), "[t]he use of a percentage as a numerical threshold such as 5%, may provide the basis for a preliminary assumption" of materiality, but a bright line percentage "cannot appropriately be used as a substitute for a full analysis of all relevant considerations." 64 Fed. Reg. at 45,151. Among useful qualitative factors are (1) "whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability," 64 Fed. Reg. at 45,152, and (2) whether management expects "that the misstatement will result in a significant market reaction," JP Morgan, 553 F.3d at 198.

## II.

CBRE's Registration Statement represented that loans or other investments would be considered impaired "when it is deemed probable that [CBRE] will be unable to collect all amounts due according to the contractual terms of the original agreements." In the Second Amended Complaint, Plaintiffs rely on the statements of several confidential witnesses to support their allegations concerning CBRE's knowledge that the Triton Loans were impaired. One witness, a former regional manager of Freemont, explained that prior to the IPO, Freemont was in constant discussions with Triton about the out-of-balance condition of its loan and that the out-of-balance condition caused Triton to seek a $5 to $10 million capital infusion from a group of outside investors. As previously discussed, Freemont and CBRE entered into an Intercreditor Agreement after they closed on the Monterey loans; the Agreement provided that "Freemont communicate with CBRE upon the occurrence of potential default events . . . . [and that] one such potential event of default . . . required that Freemont notify CBRE upon the occurrence of a so-called 'out-of-balance' condition, which is more commonly referred to as a construction cost overrun." Freemont's

17

contractually-mandated discussions with CBRE, Plaintiffs allege, should have apprised CBRE that the Monterey Loan was impaired, or at least likely to be impaired.

Because we are at the pleading stage, we accept Plaintiffs' allegations as true and draw all reasonable inferences in Plaintiffs' favor. See Johnson v. Rowley, 569 F.3d 40, 43 (2d Cir. 2009) (per curiam). Therefore, because Freemont was aware of cost overruns at The Monterey and because the Intercreditor Agreement required Freemont to disclose potential default events to CBRE, a plausible inference may be drawn that CBRE was aware of the cost overruns and was thereby aware of an existing trend, event or uncertainty under Item 303. 17 C.F.R. § 229.303(a)(3)(ii); see Blackstone, 634 F.3d at 716 (observing that Item 303 "imposes a disclosure duty where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.") (internal quotation mark omitted). "[T]he sole remaining issue is whether the effect of the 'known' information was 'reasonably likely' to be material for the purpose of Item 303 and, in turn, for

18

the purpose of Sections 11 and 12(a)(2)."  Blackstone, 634 F.3d at 716.

### III.

The district court, eliding any discussion of the traditional quantitative and qualitative factors used to assess materiality, instead dismissed the Second Amended Complaint on the sole ground that the alleged misstatements and omissions were not material because the Triton Loans were adequately collateralized at the time of the IPO.  See Hutchison I, 638 F. Supp. 2d at 275-76.  While this bright line rule has considerable appeal, this is not a case in which we should consider adopting it, because the unambiguous wording of the Registration Statement defines "impairment" in a way that discounts any issue of collateralization:  "Loans and other investments are considered to be impaired, for financial reporting purposes, when it is deemed probable that the Company will be unable to collect all amounts due *according to the contractual terms of the original agreements* . . . ." (emphasis added). Even assuming the Triton Loans were fully collateralized, a loan default would result in (at least) a temporary loss to

19

CBRE because in the event of a default, CBRE would have to initiate foreclosure proceedings that would entail delay, fees, costs and prolonged uncertainty.  Even if CBRE could ultimately recover the full amount of its loan after a foreclosure, and even if a default ultimately "would not harm CBRE," id. at 277,  CBRE would not have collected "according to the contractual terms of the original agreements."  Without categorically rejecting the district court's collateralization approach, we hold that it cannot decide this case.  Adequacy of collateral is one of the qualitative factors--but not the only one--that determines whether a misstatement or omission concerning the loan is material.

We therefore turn to quantitative measures.  To do so, we must at the outset reconcile two recent decisions in our Circuit, each of which analyzed whether statements in a registration statement were material for purposes of a Section 11 claim: ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187 (2d Cir. 2009), and Litwin v. Blackstone Grp., L.P., 634 F.3d 706 (2d Cir. 2011).  In JP Morgan, the panel conducted a quantitative materiality analysis that compared the value of

the troubled investment to the value of the defendant's entire investment portfolio, whereas the Blackstone panel, conceding that the troubled investment did not meet the 5% quantitative threshold when considered as a part of the company's entire portfolio, determined that the investment was qualitatively material nevertheless by weighing the impact of the troubled loan on the constituent part of Blackstone's business in which the loan was located.

In JP Morgan, plaintiffs alleged that JP Morgan Chase Co. ("JP Morgan") made material misstatements concerning $2 billion in prepay transactions that JP Morgan made to a special purpose entity that, in turn, made loans to Enron Corporation. 553 F.3d at 193. We first looked to the quantitative factors and observed:

> Although $2 billion in prepay transactions may sound staggering, the number must be placed in context--reclassifying $2 billion out of one category of trading assets (derivative receivables) totalling $76 billion into another category (loan assets) totalling $212 billion does not alter JPMC's total assets of $715 billion. Moreover, the underlying assets in either classification carry some default risk. As the district court said about this same information, "[c]hanging the accounting treatment of approximately 0.3% of JPM Chase's total assets from trades to loans would not have been material to investors."

Id. at 204 (quoting In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 631 (S.D.N.Y. 2005)) (internal citation

21

omitted).  On appeal, we approved the quantitative approach as "a good starting place for assessing the materiality of the alleged misstatement," and reasoned that "[a]n accounting classification decision that affects less than one-third of a percent of total assets does not suggest materiality."  Id.  We added that a further necessary consideration is the qualitative factors set forth in SAB No. 99.  Id.

In Blackstone, the plaintiffs alleged that Blackstone Group, L.P. ("Blackstone") invested: (1) approximately $331 million in FGIC Corp., a monoline financial guarantor, 634 F.3d at 711; (2) $3.1 billion in Freescale Semiconductor, Inc., a semiconductor designer and manufacturer, id.; and (3) an undisclosed amount in residential real estate investments, id. at 712.  Plaintiffs alleged that at the time of Blackstone's $4.5 billion IPO, FGIC faced massive losses as a result of the housing market collapse, id. at 711, and that Freescale had lost an exclusive agreement to manufacture chipsets for its largest customer, id. at 711-12.  We conceded that "Blackstone's investments in FGIC and Freescale f[e]ll below the presumptive 5% threshold of materiality," but held that "the District Court erred in its

22

analysis of certain qualitative factors related to materiality." Id. at 719. First, we held that Blackstone could not rely on its corporate structure to argue immateriality on the ground that a loss in one division was offset by a gain in another. Id. Second--and critical for present purposes--we held that the district court "erred in finding that the alleged omissions did not relate to a significant aspect of Blackstone's operations." Id. The Corporate Private Equity group was represented by Blackstone to be its "flagship segment" and had a critical role in the overall enterprise. Id. at 720. "Even where a misstatement or omission may be quantitatively small compared to a registrant's firm-wide financial results"--Blackstone's investment in Freescale was a relatively minor piece of Blackstone's total investments, accounting for 9.4% of the Corporate Private Equity segment's assets under management-- "its significance to a particularly important segment of a registrant's business tends to show its materiality." Id.

We need to consider these two opinions together in order to decide in this case whether to gauge the materiality of the Triton Loans in terms of CBRE's entire portfolio or its portfolio of mezzanine loans only. It is

clear that <u>Blackstone</u> does not purport to limit or affect the holding of <u>JP Morgan</u>: a panel is "bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court." <u>United States v. Wilkerson</u>, 361 F.3d 717, 732 (2d Cir. 2004). So we need to identify the crucial factor or fact that renders <u>Blackstone</u> consistent with the holding of <u>JP Morgan</u>. It is this: If a particular product or product-line, or division or segment of a company's business, has independent significance for investors, then even a matter material to less than all of the company's business may be material for purposes of the securities laws. Hypothetically, such a product or segment might be the company's original niche, its iconic or eponymous business, critical to its reputation, or most promising for growth or as an engine of revenue. Thus <u>Blackstone</u> emphasized as a qualitative factor that the Corporate Private Equity group was the firm's "flagship segment": "a reasonable investor would almost certainly want to know information related to that segment that Blackstone reasonably expects will have a material adverse effect on its future revenues." <u>Blackstone</u>, 634 F.3d at 720.

24

CBRE is "a commercial real estate speciality finance company that is primarily focused on originating, acquiring, investing, financing, and managing a diversified portfolio of commercial real estate-related loans and securities." Plaintiffs claim that the entirety of the Triton Loans-- $51.5 million--constituted "25% of CBRE's mezzanine loans which were 60% of CBRE's total capital, 27% of all of CBRE's loans, and 21% of CBRE's entire investment portfolio." Thus Plaintiffs isolate some of CBRE's transactions (mezzanine loans) as a notional division or segment in which the Triton Loans could loom as material in quantitative terms. However, Plaintiffs have not alleged (plausibly or otherwise) that mezzanine loans constitute a component of CBRE's business that is of distinct interest to investors other than as another component of CBRE's book of business. For a company that makes real estate loans, mezzanine loans (which are one tier in the hierarchy of secured interests) are not the subject of investors' fixation. So any alleged impairment of the Triton Loans must be analyzed in relation to CBRE's entire investment portfolio ($1.1 billion), consistent with the quantitative approach in JP Morgan.

In that light, the Triton Loans were not material.

25

Moreover, the Second Amended Complaint fails to allege how much of the Triton Loans was impaired at the time of the IPO. It is alleged that when CBRE foreclosed on the Triton Loans, long after the IPO, it incurred a $7.8 million impairment charge on the write-down of the Monterey Loan; but it is not alleged that this figure (or some other dollar amount of impairment) was known to CBRE at the time of the IPO.[5]

As to the qualitative analysis, Plaintiffs rely on two SAB No. 99 factors to support their contention that the misstatements and omissions were material: (A) CBRE's stock price drop following disclosure of the Triton Loans'

_____

[5] Plaintiffs seek to rely on facts outside the Second Amended Complaint--namely, CBRE's counterclaims in a lawsuit filed against the principals of Triton in the United States District Court for the District of Maryland--to suggest that CBRE suffered $22.6 million in damages due to Triton's default and that CBRE knew (prior to the IPO) that Triton was experiencing financial difficulties and might not have been able to make timely interest payments. See CBRE Fin. TRS, LLC v. McCormick, No. 08-cv-1964, 2009 WL 4782124, at *10 (D. Md. Dec. 8, 2009) (granting CBRE summary judgment and awarding more than $22.6 million in damages). Even assuming that either the district court below or this Court could consider those extraneous facts, $30.4 million ($7.8 million impairment plus $22.6 million in damages) out of a total investment portfolio of $1.1 billion falls well short of SAB No. 99's 5% threshold and is therefore presumed to be quantitatively immaterial. See 64 Fed. Reg. at 45,151; see also JP Morgan, 553 F.3d at 204 (analyzing misreported transaction as a portion of JP Morgan's total assets).

impairment, and (B) the impact on a major portion of CBRE's business.  See SAB No. 99, 64 Fed. Reg. at 45,152 ("Among the considerations that may well render material a quantitatively small misstatement . . . are-- . . . Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability . . . . [and] the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures . . . .").

(A) <u>Stock Drop</u>.  The Second Amended Complaint alleges, as cause and effect, that "the price of CBRE common stock declined more than 18%, on extremely heavy [trading] volume," in the two days following CBRE's February 26, 2007 press release reporting that the Monterey Loan was non-performing and that the Rodgers Forge Loan was placed on CBRE's watch list.  However, that same press release reported lower-than-expected 2006 fourth quarter financial results.  CBRE Realty Finance, Inc., Fourth Quarter and Full Year 2006 Results (Form 8-K) (February 26, 2007).  (That press release also advised that the Triton Loans were fully collateralized.  <u>Id.</u>)

27

The Second Amended Complaint also alleges, as cause and effect, that "the price of CBRE stock declined from $6.21 per share to $4.25 per share, a decline of 32%[,] and 70% lower than the IPO price of $14.50, on extremely heaving trading volume," after CBRE's August 6, 2007 press release disclosing that CBRE had taken a $7.8 million impairment charge due to the write-down of the Monterey Loan and that CBRE had foreclosed in May 2007 on both The Monterey and The Rodgers Forge. However, the disclosures in the August 2007 press release included that CBRE "ha[d] halted making new investments in the near-term" and that CBRE was being required to post an additional $26.7 million in collateral by one of its primary lenders--something that CBRE stated in its Prospectus could have dire consequences: "Posting additional collateral to support our credit facilities will reduce our liquidity and limit our ability to leverage our assets. In the event we do not have sufficient liquidity to meet such requirements . . . . [it could] result in a rapid deterioration of our financial condition and possibly necessitate a filing for [bankruptcy protection]." CBRE Realty Finance, Inc., Second Quarter 2007 Results (Form 8-K) (August 7, 2007).

28

These (insufficient) cause-and-effect allegations exemplify the warning in SAB No. 99 (which we adopted in JP Morgan): "[c]onsideration of potential market reaction to disclosure of a misstatement is by itself too blunt an instrument to be depended on in considering whether a fact is material."  64 Fed. Reg. at 45,152 (internal quotation marks omitted); see JP Morgan, 553 F.3d at 205 ("SAB No. 99 limits the usefulness of [market volatility] to instances where management expects 'that a known misstatement may result in a significant positive or negative market reaction.'" (quoting SAB No. 99, 64 Fed. Reg. at 41,152)). CBRE's press releases were loaded with news (largely very bad), any item of which could have caused CBRE's stock price to drop.  Moreover, CBRE had already reported the foreclosures when they happened, in May 2007; so, that item in the August 2007 press release was not information new to the market.

As in JP Morgan, Plaintiffs have not pled facts "that would permit the inference that [CBRE] expected that the alleged [omissions concerning the Triton Loans would] result in a significant market reaction."  JP Morgan, 553 F.3d at 205.  Thus, the market's reaction to CBRE's press releases

29

does not "point towards qualitative materiality under SAB No. 99." Id.

(B) Business Impact. Plaintiffs' contention that the impairment of the Triton Loans impacted a major segment of CBRE's business fails for the same reasons we hold that the loans were not quantitatively material, i.e., the loans did not compose a significant portion of CBRE's loan portfolio. Moreover, the fact that the Triton Loans were fully collateralized, as identified by CBRE in its May 7, 2007 Form 8-K, militates in favor of finding that a major segment of CBRE's business ultimately was not threatened by the impairment of the loans.

## IV.

Section 15 imposes joint and several liability on "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under" § 11. 15 U.S.C. § 77o(a). "To establish § 15 liability, a plaintiff must show a 'primary violation' of § 11 and control of the primary violator by defendants." In re Lehman Bros., 2011 WL 1778726, at *14 (quoting JP Morgan, 553 F.3d at 206–07). Because Plaintiffs failed to plead a

§ 11 claim, their § 15 claim necessarily fails.  See, e.g., SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472-73 (2d Cir. 1996).

**V.**

We review denial of leave to amend under an "abuse of discretion" standard.  See, e.g., McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007).  When the denial of leave to amend is based on a legal interpretation, such as a determination that amendment would be futile, a reviewing court conducts a de novo review.  See, e.g., Littlejohn v. Artuz, 271 F.3d 360, 362 (2d Cir. 2001) ("[I]f the denial of leave to amend is based upon a legal interpretation . . . we review the decision de novo."); see also Gorman v. Consol. Edison Corp., 488 F.3d 586, 592 (2d Cir. 2007) (reviewing de novo a district court's denial of leave to amend on grounds of futility).

The district court ruled that "amending the complaint would be futile because the proposed third amended complaint fails to cure the pleading deficiency concerning materiality that plagued the three previous iterations," i.e., failure to "allege a collateral shortfall at the time the

31

Registration Statement and prospectus issued." <u>Hutchison II</u>, 2010 WL 1257495, at *3. Because we affirm the district court's dismissal of Plaintiffs' Second Amended Complaint on alternative grounds, we cannot affirm the denial of Plaintiffs' motion to amend on the futility ground cited by the district court.[5]

We affirm nevertheless. As discussed above, even assuming Plaintiffs supplement their allegations with facts drawn from CBRE's lawsuit in Maryland--<u>i.e.</u>, that CBRE suffered $22.6 million in damages--Plaintiffs' allegations fail to satisfy any of SAB No. 99's quantitative or qualitative materiality factors. Amending the Second Amended Complaint would be futile.

## CONCLUSION

The judgment of the district court is affirmed.

---

[5] Plaintiffs did not raise any challenges to the district court's denial of their motion for reconsideration; therefore, Plaintiffs have waived any such argument. <u>See Norton v. Sam's Club</u>, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.").