*IBEW Local Union v. Royal Bank of Scotland*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

––––––––––––––––––––

August Term 2013

(Argued:    June 19, 2014        Decided:    April 15, 2015)

Docket No. 13-3289

––––––––––––––––––––

IBEW LOCAL UNION NO. 58 PENSION
TRUST FUND AND ANNUITY FUND,
*Lead Plaintiff-Appellant,*

LIGHTHOUSE FINANCIAL GROUP,
INDIVIDUALLY AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED,
*Plaintiff,*

ETHAN GOLD,
INDIVIDUALLY AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED,
*Movant-Consolidated Plaintiff,*

*v.*

THE ROYAL BANK OF SCOTLAND GROUP, PLC,
SIR THOMAS FULTON MCKILLOP, JOHN CAMERON,
*Defendants-Appellees,*

SIR FREDERICK ANDERSON GOODWIN,
*Defendant-Consolidated Defendant-Appellee,*

THE ROYAL BANK OF SCOTLAND PLC, SIR, LAWRENCE K. FISH, GORDON F. PELL, GUY R. WHITTAKER, COLIN A.M. BUCHAN, JAMES CURRIE, SIR STEPHEN A. ROBSON, ROBERT A. SCOTT, PETER D. SUTHERLAND, ARCHIBALD HUNTER, CHARLES J. KOCH, JOSEPH P. MACHALE, MERRILL LYNCH, PIERCE, FENNER & SMITH CORPORATED, GREENWICH CAPITAL MARKETS, LLC, WACHOVIA CAPITAL MARKETS, INC., WACHOVIA CAPITAL MARKETS, LLC, MORGAN STANLEY & CO. INCORPORATED, UBS SECURITIES LLC, RBC CAPITAL MARKETS CORPORATION, BANC OF AMERICA SECURITIES LLC, FREDERICK A. GOODWIN, SIR THOMAS MCKILLOP, JANIS KONG, MARK FISHER, JAMES MCGILL CURRIE, WILLIAM M. FRIEDRICH,
*Defendants*,

SIR THOMAS FULTON WILSON MCKILLOP, JOHN ALISTAIR NIGEL CAMERON,
*Consolidated Defendants*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

Before:

WINTER, LEVAL, and CHIN, *Circuit Judges*.

---

Appeal from orders of the United States District Court for the Southern District of New York (Daniels, *J.*) dismissing securities fraud claims and denying motions for reconsideration, to alter or amend the judgment, and for leave to file a second amended complaint.

AFFIRMED.

Judge Leval concurs in part and dissents in part in a separate opinion.

---

JOSEPH D. DALEY (Theodore J. Pintar, Jason A. Forge, Darryl J. Alvarado, Samuel H. Rudman, *on the brief*), Robbins Geller Rudman & Dowd LLP, San Diego, California, and Melville, New York, *for Plaintiffs-Appellants*.

SETH P. WAXMAN (Matthew Guarnieri, David S. Lesser, Andrea J. Robinson, Nolan J. Mitchell, *on the brief*), Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, New York, New York, and Boston, Massachusetts, *for Defendants-Appellees*.

---

CHIN, *Circuit Judge*:

In this putative securities class action, investors who purchased or acquired American Depository Shares ("ADSs") of The Royal Bank of Scotland Group, PLC ("RBS") allege that RBS and several of its top executives made false and misleading statements that inflated the ADSs' prices. They brought this action below under, *inter alia*, sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

The district court (Daniels, *J.*) granted defendants' motion to dismiss and denied plaintiffs' motions for reconsideration, to alter or amend the judgment, and for leave to amend. Plaintiffs appeal. We affirm.

## STATEMENT OF THE CASE

**A.** *The Facts*

The facts alleged in the proposed Second Consolidated Amended Complaint ("SCAC") are assumed to be true. They may be summarized as follows:

Between 2001 and 2006, RBS -- one of the world's largest financial institutions -- experienced rapid growth by repackaging residential subprime mortgages and leveraged loans into residential mortgage backed securities ("RMBS"), collateralized debt obligations ("CDOs"), and collateralized loan obligations ("CLOs"). The housing market bubble burst in 2006 as housing sales decreased, inventories increased, mortgage delinquencies soared, and subprime assets lost much of their value. In part, the market collapsed because of the rise of "less creditworthy borrowers, more highly leveraged loans, and more risky mortgage structures," which ultimately caused massive defaults. App. at 1179.

RBS, along with many of its peers, deteriorated as the housing and credit markets crumbled.

RBS's financial downfall was compounded by the timing of its acquisition of ABN AMRO, a Dutch bank also heavily invested in credit markets, in October 2007. Plaintiffs acquired RBS ADSs on the open market between October 17, 2007 and January 20, 2009 (the "Class Period"), including ADSs acquired pursuant to the ABN AMRO acquisition.

Prior to and during the Class Period, RBS provided an optimistic outlook as discussed further below. On April 22, 2008, RBS announced a Rights Issue to issue additional shares and raise capital. Notwithstanding its attempts to raise capital and salvage its business, RBS could not survive the market's crash. The U.K. government provided an initial $40 billion bailout and took a 94% ownership stake in RBS. The price of the ADSs dropped substantially during the Class Period.

Plaintiffs contend that defendants made fraudulent statements to investors in three respects: (1) RBS's exposure to subprime assets, (2) the success (or lack thereof) of RBS's acquisition of ABN AMRO, and (3) RBS's Rights Issue announcement to raise capital.

1.  *Exposure Statements*

Plaintiffs claim that RBS misrepresented its exposure to subprime assets on three occasions. First, during an August 3, 2007 conference call, John Cameron, Chief Executive of Corporate Banking and Financial Markets and a director of RBS, was asked about RBS's exposure to leveraged lending and CDOs. He responded that RBS's "exposure to these sorts of markets" had been "cut back a lot since the year end of '06." App. at 1346. Cameron added that "[w]e have hedges in all sorts of places against the various portfolios" and "[w]e've taken no credit losses anywhere in the portfolio." App. at 1346. During the call, Frederick Anderson Goodwin, RBS's CEO and a director of RBS, and Sir Thomas Fulton McKillop, Chairman of the Board of RBS, also represented that RBS had not been affected by the crash of the subprime mortgage market. Plaintiffs allege that these statements were false because RBS had increased its CDO holdings in 2007, RBS's CDO exposure was not hedged, and RBS incurred at least $425 million in losses.

Second, four months later, in its December 6 press release, RBS represented that its total U.S. subprime exposure amounted to $10.3 billion. Plaintiffs contend that this misrepresented RBS's true exposure of $17.1 billion,

- 6 -

and also allege that RBS failed to disclose an additional $14.4 billion in insured risk. Plaintiffs contend that RBS misrepresented the amount of CDOs and subprime assets held by RBS.

Third, on February 28, 2008, RBS purported to disclose its full "Credit Market Exposures" as of December 31, 2007. The amount was not limited to U.S. subprime exposures, and also included exposures from the ABN AMRO acquisition. Plaintiffs claim that one year later, RBS "corrected" the figures in Appendix II to its year-end 2008 financial results, revealing that RBS had over $66 billion more credit-market assets on its balance sheet than it had previously stated.

2. *ABN AMRO Statements*

The statements related to the ABN AMRO acquisition arise from the same December 6, 2007 press release and February 28, 2008 conference call. The 2007 press release contained the following statement from Goodwin: "The integration of ABN AMRO is off to a promising start . . . . The acquisition of ABN [AMRO] has rarely seemed more attractive and relevant than it does at this point." App. at 1375. In the 2008 conference call, Goodwin made the following statements: "the positive view we have of the ABN [AMBRO] businesses has

been confirmed"; "[u]nderlying performance of retained ABN AMRO businesses [is] in line with expectations"; "[t]here are a lot of areas where [the ABN AMRO acquisition] just goes ching, ching, ching, ching, ching"; "[w]e are happy we bought what we thought we bought." App. at 1378. An RBS manager also stated that the ABN businesses were "kind of in line with where we thought they would be and probably is slightly ahead of the equivalent number last year." *Id*. Plaintiffs contend that these statements misrepresented the immediate and substantial loss suffered by ABN AMRO, and thereby suffered by RBS.

### 3. *Rights Issue Statements*

Finally, the statements related to the Rights Issue arise from the February 28, 2008 conference call where Goodwin stated that "[t]here are no plans for any inorganic capital raisings or anything of the sort." App. at 1370-71. On April 22, 2008, RBS announced a £12 billion Rights Issue. McKillop stated that the Rights Issue was "purely the Board of RBS decision" and "we were not asked to raise capital by anyone so we have to be very, very clear about that." App. at 1372. Goodwin echoed McKillop, stating, "I completely agree with that." *Id.* "[T]he [Financial Services Authority (the "FSA")] are happy to see us raising capital and encourage us in our plans to do so, but they didn't request us to do

it." *Id.* Plaintiffs contend that these statements are false because Hector Sants, the CEO of the FSA, the U.K.'s regulatory authority, later testified to the U.K. Parliament that he had a conversation with RBS on April 9, 2008, and told RBS that it was "specifically required . . . to have a rights issue," and that the FSA "required them to raise as much capital as possible." *Id.*

**B.** *The Proceedings Below*

On January 19, 2011, plaintiffs commenced this action asserting claims for securities law violations. On November 1, 2011, they submitted a Consolidated Amended Complaint ("CAC"). Plaintiffs asserted claims for violations of the Securities Act of 1933, and violations of Sections 10(b) and 20(a) of the Exchange Act. On January 13, 2012, defendants moved to dismiss the CAC for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), and under the forum non conveniens doctrine. On September 28, 2012, the district court granted defendants' motion to dismiss. Judgment was entered on October 2, 2012.

On October 12, 2012, plaintiffs moved for reconsideration. They also moved to alter or amend the judgment. The district court concluded that, in substance, the motions were for leave to amend the CAC, and so analyzed the

- 9 -

motions under that standard. The district court concluded that the SCAC,[1] attached to plaintiffs' reply brief in support of its motion to alter or amend the judgment, failed to state a claim, and denied leave to amend as futile. Accordingly, on August 6, 2013, the district court denied plaintiffs' motions.

This appeal followed.

## DISCUSSION

### A.    Applicable Law

We review the district court's grant of a motion to dismiss *de novo.* *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). "To survive a motion to dismiss, a complaint must plead enough facts to state a claim to relief that is plausible on its face. Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the [Private Securities Litigation Reform Act] and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud." *Id.* (citations and internal quotation marks omitted).

We review the district court's denial of leave to amend *de novo* where "the denial was based on an interpretation of law, such as futility." *Panther*

---

[1]     The SCAC disavowed all Securities Act claims, and narrowed the Exchange Act claims to focus on the three categories of misstatements identified above.

- 10 -

*Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012).  Proposed

amendments are futile if they "would fail to cure prior deficiencies or to state a

claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure."  *Id.*  Thus, the

standard for denying leave to amend based on futility is the same as the standard

for granting a motion to dismiss.

To establish a § 10(b) claim, a plaintiff must prove:  (1) the defendant

made a material misrepresentation or omission; (2) with scienter; (3) in

connection with the purchase or sale of a security; (4) reliance; (5) economic loss;

and (6) loss causation.  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552

U.S. 148, 157 (2008).

A statement or omission is material if "there is a substantial

likelihood that a reasonable shareholder would consider it important in deciding

how to act."  *ECA*, 553 F.3d at 197 (alterations and internal quotation marks

omitted).  "In other words, . . . for the misstatement to be material, there must be

a substantial likelihood that the disclosure of the omitted fact would have been

viewed by the reasonable investor as having significantly altered the 'total mix'

of information made available."  *Id.* (internal quotation marks omitted).  On a

motion to dismiss, a complaint may not be properly dismissed unless the

misstatements are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* (internal quotation marks omitted).

Plaintiffs' complaint relies heavily on a report issued by the FSA (the "FSA Report") and on testimony given in a parliamentary inquiry on RBS's collapse for its factual allegations regarding misleading statements by RBS made with scienter. Both the FSA Report and the testimony are cited in the SCAC, and their contents as public documents are not subject to reasonable dispute. *See* Fed. R. Evid. 201(b)(2). We may, therefore, consider them in determining the merits and context of the allegations of the SCAC that are based on them. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2d Cir. 1991).

## B.  *Application*

We discuss each of the three sets of allegedly fraudulent statements in turn.

### 1.  *Exposure Statements*

#### a.  *August 3, 2007 Statements*

The August 3, 2007 statements regarding RBS's exposure were made prior to the start of the Class Period and cannot be the basis of liability unless

- 12 -

there was a duty to update or correct them. *See Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 154 (2d Cir. 2007). Because the statements referred only to past events or conditions and did not imply anything about future circumstances, there was no duty to update. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994). And because the FSA Report shows that the statements were not untrue, there was no duty to correct them. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).

The FSA Report supports the truthfulness of Cameron's statements that RBS had "cut back a lot" on some of its risky exposures. It notes that, in 2007, RBS "halted its new origination of structured credit" and "ceased all origination" of leveraged finance in July and August of that year. App. at 1275. Similarly, Cameron's statement that RBS had taken no "credit losses" on its portfolio is consistent with the FSA Report's statement that RBS took markdowns of at least $240 million on certain CDOs in response to "market developments." App. at 1287. The SCAC omits the context of Cameron's statement, which referred to market, as opposed to credit, losses.

Accordingly, we affirm the district court's holding with respect to the August 2007 statements.

**b.** *December 6, 2007 Statements*

Plaintiffs contend that RBS's December 6, 2007 press release failed to disclose $6.8 billion in subprime exposures and $14.1 billion in exposure to monoline insurers. As this Court has already recognized, the SEC has provided internal guidance with respect to determinations of materiality. *ECA*, 553 F.3d at 197. The SEC's Staff Accounting Bulletin ("SAB") No. 99 provides that a misstatement related to less than 5% of a financial statement carries the preliminary assumption of immateriality. *See* 64 Fed. Reg. 45150, 45151 (Aug. 19, 1999). This "rule of thumb," however, is not conclusive. Courts must also consider qualitative factors, which can turn a quantitatively immaterial statement into a material misstatement. *See id.* at 45152. Such qualitative factors include, among others: whether the misstatement "arises from an item capable of precise measurement"; "masks a change in earnings or other trends"; "changes a loss into income or vice versa"; "concerns a segment or other portion of the . . . business that has been identified as playing a significant role in the registrant's operations or profitability"; "involves concealment of an unlawful transaction"; and whether "a known misstatement may result in a significant positive or negative market reaction." *Id.*

Plaintiffs allege that RBS understated its exposure in its December 2007 press release. The allegedly undisclosed $6.8 billion constitutes less than 4% of RBS's total asset backed securities exposure, and less than 1% of its total assets. SAB No. 99 suggests that this low percentage of assets "may provide the basis for a preliminary assumption that . . . a deviation of less than [5% on] the registrant's financial statement[] is unlikely to be material." *See* 64 Fed. Reg. 45150, 45151; *see, e.g.*, *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011) (stating that materiality turns on whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available" (internal quotation marks omitted)); *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *15 (S.D.N.Y. Sept. 28, 2012) (stating that undisclosed $100 billion portfolio constituted approximately 5% of overall portfolio and was not an "undue risk concentration" compared to entire UBS balance sheet). This quantitative assumption is not dispositive, and we thus consider all relevant qualitative circumstances related to the alleged misstatements.

The qualitative factors here do not favor treating the presumptively immaterial statements as material statements. Plaintiffs do not allege that the amount of exposure could have been calculated precisely, masks a change in earnings, changes a loss into income or vice versa, or involves an unlawful transaction, or that the misstatements resulted in a significant positive market reaction. And, although RBS's asset-backed securitization group was a driving factor in its profitability, this factor alone does not tip the scales in favor of finding the misstatements material.

Even if the qualitative factors weighed more heavily in favor of plaintiffs, we would still dismiss the misstatements for failure to plead fraud. The SCAC alleges that the December press release disclosed $10.3 billion in "Total US sub-prime exposures." App. at 1355. Plaintiffs argue that this disclosure was fraudulent because RBS disclosed $17.1 billion in actual sub-prime holdings in its 2008 Annual Report. This $17.1 billion amount is comprised of Super Senior CDOs, other CDOs, and subprime U.S. RMBS. The SCAC does not explain how the Court can determine whether the "Total US sub-prime exposures," a subset of global CDOs, is the same subset comprised of Super Senior CDOs, other CDOs, and subprime U.S. RMBS. Without any factual

- 16 -

allegations supporting the proposition that the two are the same, plaintiffs fail to adequately plead fraud.  *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Co.*, 75 F.3d 801, 813 (2d Cir. 1996) (stating "false comparison between the figures" does not adequately plead fraud).

Similarly, plaintiffs fail to explain how the $14.1 billion monoline insurers constitute subprime exposures or that RBS had an obligation to disclose them as U.S. subprime exposures "net of hedges."[2]  The SCAC also does not allege that RBS had an obligation to disclose CLOs in its Trading Statement; the Trading Statement's focus was U.S. subprime exposures, including CDOs.

### c.  *February 28, 2008 Statements*

Plaintiffs allege that RBS failed to disclose $66 billion in assets in its 2007 Annual Results.  Plaintiffs allege that RBS later corrected the 2007 numbers in Appendix II to its 2008 Annual Report, which issued one year later.[3]  Our review of the record reveals that the 2007 Annual Results did not omit assets and that Appendix II does not correct any misstatement of the 2007 numbers. (*Compare* App. at 480 (disclosing 2007 results including £2,581 high grade CDOs,

---

[2]    "Monoline exposures relate to credit protection purchased on credit assets, including CDOs."  App. at 559.

[3]    The SCAC converts £ to $ without providing a conversion rate or any additional information.  For consistency and ease of understanding, we use the £ values indicated in the record.

£1,253 mezzanine CDOs, £1,292 sub-prime trading inventory, £8,698 leveraged finance, £2,233 Alt-A, and £1,386 CLOs), *and* App. at 559 (£2,547 monoline exposures), *with* Supp. App. at 40-41 (disclosing 2007 results including £2,581 high grade CDOs, £1,253 mezzanine CDOs, £1,292 sub-prime trading inventory, £2,233 Alt-A, £1,386 CLOs, and £2,547 monoline exposures), *and* Supp. App. at 54 (explaining that "[l]everaged finance as disclosed above for [2007 results] has been aligned with definitions used in 2008 in terms of industry classification and is additionally £76 million higher than previously published")). Thus, with the exception of leveraged finance, which RBS has explained was adjusted in accordance with 2008 definitions, Appendix II does not revise or correct the February 28 disclosure.

### 2. *ABN AMRO Acquisition Statements*

Plaintiffs allege that RBS made false statements regarding the ABN AMRO acquisition in its December 6, 2007 press release and conference call, as well as during the February 28, 2008 earnings conference call. These statements, described above and including, for example, "[t]he integration of ABN AMRO is off to a promising start," "[our] positive view . . . has been confirmed," "we are happy we bought what we thought we bought," App. at 1375, 1378, were

- 18 -

misleading according to plaintiffs, because by December 2007, ABN AMRO was suffering significant losses and the acquisition was "an unmitigated disaster for RBS," App. at 1378.

We agree with the district court's determination that these statements were inactionable puffery. Statements of general corporate optimism, such as these, do not give rise to securities violations. *See Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("companies must be permitted to operate with a hopeful outlook"); *see also ECA*, 553 F.3d at 206. Statements of corporate optimism may be actionable securities violations if "they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *In re IBM Sec. Litig.*, 163 F.3d at 107 (citations omitted). The statements here are not worded as guarantees and there are no allegations that defendants did not reasonably believe them.

### 3.    *Rights Issue Statements*

It is undisputed that in April 2008, RBS announced that it was initiating the Rights Issue to raise £12 billion in capital. In explaining this decision, defendants publicly stated that the FSA was "happy to see [RBS] raising capital and encourage[d RBS] in [its] plans to do so," but also represented that

RBS was "not asked to raise capital by anyone," including the FSA. App. at 1371-72. RBS explained that the decision to raise capital was "purely the Board of RBS['s] decision." App. at 1372. Plaintiffs contend that these statements were false because the CEO of the FSA had in fact stated in testimony to the U.K. Parliament in 2012 that RBS was "specifically required" to conduct a Rights Issue to "raise as much capital as possible." *Id.*

The timeline of events leading up to RBS's allegedly false statement reveals that plaintiffs fail to plead a basis for a securities fraud claim. As the FSA reported, RBS had already started preparations for the Rights Issue by April 4, 2008 -- five days before RBS's conversation with the FSA's CEO, when the FSA purportedly "specifically required" RBS to conduct a Rights Issue.

In its April 22, 2008 release, RBS disclosed that "in . . . light of developments during March including the severe and increasing deterioration in credit market conditions, the worsening economic outlook and the increased likelihood that credit markets could remain difficult for some time, the Board has concluded that it is now appropriate for RBS to accelerate its plans to increase its capital." App. at 557. RBS also estimated "the effect on capital of write-downs" to be "£5.9 billion before tax" in 2008, as well as a "possible asset disposal[] which

could generate £4 billion of capital." App. at 557, 564. As a result of the "sharp deterioration in market conditions and outlook in credit markets," RBS stated that "the Board has determined that it is appropriate to raise £12 billion through the rights issue" and acknowledged that "stronger capital ratios were now required in what had become a very different world for financial institutions." App. at 557-58. And, even in the allegedly fraudulent statements themselves, RBS acknowledged that "it was increasingly evident that all authorities . . . were recommending to banks that they strengthen their capital base," and specifically that the FSA was in "close and continuous" contact with RBS and that the FSA was "happy to see [RBS] raising capital and encourage[d] us in our plans to do so." App. at 1372.

In light of the total mix of information available to the reasonable investor, we conclude that RBS's statements regarding the Rights Issue are not a basis for a securities fraud claim. First, as the FSA reported, RBS had already started preparations for the Rights Issue by April 4, 2008 -- five days before the CEO of the FSA had his conversation with RBS. Hence, preparations for a Rights Issue were already under way when the FSA spoke to RBS. Second, critical facts were already known to the investing market: RBS needed an infusion of capital;

it was taking additional write-downs; the FSA was closely monitoring RBS's situation and encouraging a Rights Issue; and there was generally a steep deterioration in market conditions and credit market outlooks.

Moreover, the background of Sants's testimony, as explained in the FSA Report, shows that RBS was not deemed by the FSA to have violated FSA's minimum capital guidelines. In early April 2008, RBS's deteriorating condition caused the FSA to make "a [t]hreshold [c]onditions analysis." FSA Report, The Failure of the Royal Bank of Scotland, at 87 (December 2011), *available at* http://www.fsa.gov.uk/pubs/other/rbs.pdf. That analysis concluded that RBS "was judged still to meet Threshold Condition 4 [the adequate resources requirement], taking into account that [a minimum requirement] did not appear to have been breached and the firm now planned to raise significant capital through a rights issue." *Id.* As a result, Sants required "a written commitment from [RBS] that [it] would be pursuing a rights issue." *Id.*

In these contexts, a reasonable investor would have deemed the difference between "encouraged" and "required" to be immaterial.

*CONCLUSION*

For the reasons stated above, we AFFIRM the district court's dismissal of plaintiffs' claims as well as its order denying plaintiffs' motions for reconsideration, to alter or amend the judgment, and for leave to file the SCAC.

LEVAL, *Circuit Judge,* concurring in part and dissenting in part:

While I am in full agreement with most of the majority's well reasoned opinion, I respectfully believe that RBS's alleged statements relating to the April 2008 Rights Issue adequately stated a claim for securities fraud. According to the complaint (whose allegations we must accept as true for these purposes), the Financial Services Authority (which sets the standards financial services firms must meet in the United Kingdom),[1] advised RBS on April 9, 2008, that it was "required . . . to raise as much capital as possible." About two weeks later, on April 22, 2008, RBS made public statements declaring, "[W]e were not asked to raise capital by anyone," and the FSA "didn't request us to [raise capital]." These statements were false, and in my view materially so.

The majority argues that RBS's statements were not false because "RBS had already started preparations [for] the Rights Issue on April 4, 2008 – five days before the CEO of the FSA had his conversation with RBS." Maj. Op. at 21-22. I believe this misses the point. The fact that RBS had decided to raise capital before being told by the FSA that it had to do so does not change the fact that it was required by the FSA to raise capital. Denial of that fact was false.

The majority further argues that even if those denials were false, they were not *materially* false. RBS's top officers, while denying that RBS had been required to raise capital, acknowledged that the bank had been "encouraged" by the FSA to raise capital. In light of the

[1] The Financial Services Authority (the "FSA") was, until 2013, the regulatory body in the United Kingdom responsible for "regulat[ing] most financial services markets, exchanges and firms" and "set[ting] the standards that [financial services firms] must meet," and it had the power to "take action against firms if they fail[ed] to meet the required standards." *What we do: who we regulate*, Financial Services Authority (last updated June 14, 2014), http://www.fsa.gov.uk/about/what/who.

openly acknowledged losses RBS had sustained, requiring a write-off of £5.9 billion, the majority posits that a reasonable investor would see no material difference between the acknowledged fact that RBS had been "encouraged" by the FSA to raise capital and a further statement that it had been "required" by the FSA to do so. In my view the difference is substantial. The fact that such a regulatory agency has required a bank to raise capital implies that the regulatory agency finds the bank's capital reserves to be dangerously low. If the regulatory agency merely "encourages" the bank to raise capital, but does not require it, this implies that while the agency believes it would be prudent for the bank to raise capital, the bank's present level of capital is not dangerously low. That RBS was required by the FSA to raise capital is a fact a reasonable investor would want to know.

According to the majority opinion, a federal securities fraud claim may not properly be dismissed under Rule 12(b)(6) because false statements are not materially false unless the misstatements are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Maj. Op at 12 (quoting *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009)). In my view, the complaint alleging RBS's false denials that the FSA required RBS to raise capital easily passes that standard.