17-3293-cv

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

# AMENDED SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 20th day of November, two thousand eighteen.

PRESENT:
> PIERRE N. LEVAL,
> SUSAN L. CARNEY,
> > *Circuit Judges*,
> KATHERINE POLK FAILLA,
> > *District Judge.**

_____

IN RE: BARCLAYS BANK PLC SECURITIES LITIGATION

_____

No. 17-3293-cv

DENNIS ASKELSON,

> *Plaintiff-Appellant*,

MARSHALL FREIDUS, on behalf of himself and all others similarly situated, STEWART THOMPSON AND SHARON THOMPSON, Trustees for the S.O. Thompson Rev. Trust and the S.G. Thompson Rev. Trust, DORA L. MAHBOUBI, LARRY MORRISON, individually and on behalf of all others similarly situated, JEFFREY LEFCOURT, on behalf of himself and all

---

* Judge Katherine Polk Failla, of the United States District Court for the Southern District of New York, sitting by designation.

others similarly situated, BEVERLY PELLEGRINI, on behalf of herself and all others similarly situated, and ALFRED FAIT, on behalf of himself and all others similarly situated,

*Plaintiffs*,

v.

BARCLAYS BANK PLC, BARCLAYS PLC, JOHN SILVESTER VARLEY, ROBERT EDWARD DIAMOND, JR., SIR RICHARD BROADBENT, RICHARD LEIGH CLIFFORD, DAME SANDRA J.N. DAWSON, SIR ANDREW LIKIERMAN, SIR NIGEL RUDD, STEPHEN GEORGE RUSSELL, JOHN MICHAEL SUNDERLAND, BARCLAYS CAPITAL SECURITIES LIMITED, CITIGROUP GLOBAL MARKETS, INC., MERRILL LYNCH, PIERCE, FENNER, & SMITH INCORPORATED, WACHOVIA CAPITAL MARKETS, LLC, MORGAN STANLEY & CO. LLC, UBS SECURITIES LLC, RBC DAIN RAUSCHER, INC., MARCUS AGIUS, CHRISTOPHER LUCAS, GARY A. HOFFMAN, FREDERIK SEEGERS, DAVID G. BOOTH, FULVIO CONTI, DANIEL CRONJE, BANC OF AMERICA SECURITIES, LLC,

*Defendants-Appellees,*

MATTHEW WILLIAM BARRETT, NAGUIB KHERAJ, A.G. EDWARDS & SONS, INC., BNP PARIBAS SECURITIES CORP., GOLDMAN, SACHS & CO., KEYBANC CAPITAL MARKETS INC., SUNTRUST CAPITAL MARKETS, INC., WELLS FARGO SECURITIES, LLC,

*Defendants.*

| | |
|---|---|
| FOR APPELLANT: | JOSEPH D. DALEY (Lucas F. Olts, *on the brief*), Robbins Geller Rudman & Dowd LLP, San Diego, CA. |
| | Andrew L. Zivitz, Sharan Nirmul, Richard A. Russo, Jr., Kessler Topaz Meltzer and Check, LLP, Radnor, PA. |
| FOR APPELLEES: | MICHAEL T. TOMAINO, JR. (Thomas C. White, *on the brief*), Sullivan & Cromwell LLP, New York, NY, *for Appellees Barclays Bank PLC, Barclays PLC, John Silvester Varley, Robert Edward Diamond, Jr., Sir Richard Broadbent, Richard Leigh Clifford, Dame Sandra J.N. Dawson, Sir Andrew Likierman, Sir Nigel Rudd, Stephen George Russell, John Michael Sunderland, Marcus Agius, Christopher Lucas, Gary A. Hoffman,* |

*Frederik Seegers, David G. Booth, Fulvio Conti, and Daniel Cronje.*

Jay B. Kasner, Scott D. Musoff, Patrick G. Rideout, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, *for Appellees Barclays Capital Securities Limited, Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Wachovia Capital Markets, LLC, Morgan Stanley & Co. LLC, UBS Securities LLC, RBC Dain Rauscher Inc., Banc of America Securities, LLC.*

Appeal from a judgment of the United States District Court for the Southern District of New York (Crotty, *J.*).

**UPON DUE CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment entered on September 14, 2017, is **AFFIRMED.**

Plaintiff-Appellant Dennis Askelson, proceeding on behalf of a certified investor class, appeals from a judgment of the United States District Court for the Southern District of New York (Crotty, *J.*), granting summary judgment on his claims arising under sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77o. Askelson sought relief on behalf of purchasers of Barclays Bank PLC's April 8, 2008 Series 5 offering of American Depositary Shares ("ADS"), alleging that those securities were issued pursuant to materially false and misleading "Offering Materials."[1] Defendants-Appellees are Barclays Bank PLC, its holding company Barclays PLC, and a number of Barclays directors and executives (collectively, "Barclays"), together with the several investment banks that underwrote the April 2008 offering (the "Underwriters"). [2]

---

[1] The Offering Materials at issue in this case are: (1) an August 31, 2007 shelf registration statement and prospectus; (2) an April 8, 2008 prospectus supplement; and (3) Barclays' Form 20-F annual report for fiscal year 2007, dated March 26, 2008, which was incorporated by reference into the prospectus supplement.

[2] The credit market assets at issue here were held by Barclays Capital, a New York-based investment banking division of Barclays. It is to be distinguished from Defendant-Appellee Barclays Capital Securities Limited,

On appeal, Askelson contends that Barclays violated section 11 principally through two material omissions in connection with its April 8, 2008 offering (the "Offering"). First, he argues, Barclays "hid" its exposure to billions of dollars in risky assets by failing to disclose in its Offering Materials the notional amount of its exposure to monoline insurers. App't Br. 35–43. Second, he asserts, Barclays failed to disclose that it had become subject to an allegedly ongoing "directive" from the United Kingdom's Financial Services Authority to maintain a Tier 1 Equity ratio above a threshold of 5.25%. *Id.* at 44–49. A branch of this second theory rests on Barclays' additional failure to divulge to investors that it experienced a marked decline in its capital ratios during the first quarter of 2008—that is, between December 31, 2007, and the Offering date of April 8, 2008. Askelson's claims under section 15 of the Securities Act, which provides for individual liability for "controlling persons," are derivative of his section 11 claims.

We assume the parties' familiarity with the underlying facts, procedural history, and arguments on appeal, to which we refer only as necessary to explain our decision to affirm.

**I.**

We review *de novo* a district court's grant of summary judgment. *Dalberth v. Xerox Corp.*, 766 F.3d 172, 182 (2d Cir. 2014). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In our review, we "construe the evidence in the light most favorable to the nonmoving party and draw all inferences and resolve all ambiguities in favor of the nonmoving party." *In re Omnicom Grp., Inc. Sec. Litig.,* 597 F.3d 501, 509 (2d Cir. 2010) (alterations omitted).

Section 11 of the Securities Act of 1933 provides securities purchasers a private right of action if any part of a registration statement, when it became effective, "contained an

which the Second Consolidated Amended Complaint calls "Barclays Securities" and describes as a separate entity that was one of the Offering's underwriters. J. App'x 79, ¶ 46.

4

untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statement therein not misleading." 15 U.S.C. § 77k(a). A plaintiff proceeding under section 11 must establish one of three bases of liability: "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 (2d Cir. 2011).

As we described in *Hutchison*, to be actionable under section 11, any misrepresentation or omission must be material. Materiality is an "inherently fact-specific finding." *Basic Inc. v. Levinson*, 485 U.S. 224, 236 (1988). It is established when a plaintiff demonstrates that there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (quoting *Basic*, 485 U.S. at 231–32).

Unlike a securities fraud plaintiff proceeding under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), a section 11 plaintiff need not demonstrate "scienter, reliance, or loss causation." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010). Nevertheless, a defendant in a section 11 action will not be liable if it can prove "negative loss causation"—that is, if it can demonstrate that the alleged misstatement or omission did not lead to a decline in its share price. *See* 15 U.S.C. § 77k(e) ("[I]f the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from [the alleged misstatement or omission], such portion of or all such damages shall not be recoverable."). To sustain this defense, a defendant must establish that "the risk that caused the losses was not within the zone of risk concealed by the misrepresentations and omissions," or that "the subject of the misstatements and omissions was not the cause of the actual loss suffered." *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 154 (2d Cir. 2017) (alterations and internal quotation marks omitted). Because section 11 "allocate[s] the risk of uncertainty to the

5

defendants," we have described rebutting loss causation as a "heavy burden." *Akerman v. Oryx Comm'ns, Inc.*, 810 F.2d 336, 341 (2d Cir. 1987).

## II.

Askelson's first theory on appeal relates to Barclays' failure to disclose the notional amount of its exposure to monoline insurers ("monolines") before the April 2008 Offering. Monolines are companies whose sole business it is to issue financial guaranty insurance instruments, the most well-known of which are credit-default swaps. Credit default swaps operate as follows, with some simplification: in exchange for regular payments, a monoline selling credit default swap protection assumes the risk that an insured financial asset will default. If the underlying asset does *not* default, the monoline profits from the payments, which are calibrated to the perceived risk presented by the asset at the time of contract. If the underlying asset *does* default before the credit default swap contract expires, however, the monoline is typically responsible for the losses on the insured asset up to the total value of the security (or another amount established by contract). While monolines historically insured relatively low-risk assets such as municipal bonds, in recent decades they began to insure increasingly risky financial products, including, as relevant here, mortgage-backed securities ("MBS"), collateralized debt obligations ("CDOs"), and other asset-backed securities ("ABS").

Barclays' Form 20-F—issued on March 26, 2008, and covering the year ending December 31, 2007—reported certain information related to "Barclays Capital['s] credit market positions." Supp. App'x 3933. After disclosing that Barclays Capital experienced "net losses of £1,635 million in 2007, due to dislocations in the credit markets," it presented in chart form data showing Barclays Capital's exposure to various types of securities. *Id.* The chart shows that, as of December 31, 2007, Barclays Capital had £6,018 million in exposure to "ABS CDO Super Senior" securities. It further reflects that, when expressed net of hedges (which it valued at £1,347 million), it had an exposure of £4,671 million to the ABS CDO Super Senior securities. *Id.* In its Form 20-F, Barclays also affirmatively represented that "[n]one of the above hedges of ABS CDO Super Senior exposures as at 31st December 2007 were held with monoline insurer counterparties." *Id.*

6

The chart additionally informs the reader that, as of December 31, 2007, Barclays Capital's exposure to monoline insurers was £1,335 million—an almost tenfold increase from the £140 million exposure reported as of June 30, 2007, six months earlier.[3] *Id.* Commentary accompanying the chart explains that "Barclays Capital held assets with insurance protection or other credit enhancement from monoline insurers. . . . There were no claims due under these contracts as none of the underlying assets were in default." *Id.*

What Barclays failed to disclose in its Form 20-F, however, and what Askelson focuses on, is the "notional amount" or "notional value" of Barclays Capital's exposure to the monolines. In this context, "notional value" refers to the figure used in the monoline contracts to quantify the full face amount of the credit default swaps (or other credit arrangements) held with the monolines—that is, the total amount that monolines would owe Barclays in the event that *all* of the underlying assets defaulted.

As of December 31, 2007, the notional value of Barclays Capital's assets that were insured by monolines was £21,573 million, over sixteen times the exposure of £1,335 million that was reported by Barclays for that date in its Form 20-F. Askelson contends that Barclays' failure to disclose this £21,573 million figure was misleading in two ways.[4] First, he says the omission permitted Barclays to "use[] its exposure to highly risky monoline insurers as a means to hide £22 billion in risky credit-market assets from investors." App't Br. 13. In other words, according to Askelson, by revealing only its measure of the value of its current

---

[3] Askelson's expert, Fiachra O'Driscoll, stated that Barclays' chart reflected its "current exposure" to monolines, which he acknowledges to be a legitimate measure, albeit one calculated by the method that produces the lowest exposure figures. Supp. App'x 2124. According to Barclays, the figures were derived by assessing the declines in value (from par) of the insured assets to arrive at an insurance value, and then reducing that amount further by a credit valuation allowance. The credit valuation allowance was a write-down intended to reflect credit risk as to the monoline insurers themselves. Appellees' Br. 12 n.7.

[4] Askelson also argues that Barclays' statement in its Form 20-F that "[n]one of the above hedges of ABS CDO Super Senior exposures as at 31st December 2007 were held with monoline insurer counterparties" is itself materially misleading because, in fact, Barclays held *additional* undisclosed ABS CDO positions insured by monolines. As the District Court correctly found, however, the text's reference to "the *above* hedges," when considered in context, left no doubt that the instant statement applied only to the specific line item in the chart immediately above it and could not reasonably be construed as an affirmative assertion by Barclays that it had *no* ABS CDO positions insured by monolines.

7

exposure to monoline insurers—but omitting the notional value, asset class, and risk profile of the underlying assets insured by the monolines—Barclays "understated its actual credit-market exposure by nearly 40% and disclosed less than half of its ABS CDO positions." *Id.* at 37. Second, Askelson maintains that Barclays' "selective" disclosure, *id.*, failed to alert investors to its actual potential exposure to the monolines themselves—and therefore to its potential losses should the monolines default and be unable to cover their credit default swaps, as indeed occurred with several of Barclays' monoline counterparties, albeit largely well after September 2008.

The District Court ruled that Askelson has not established these omissions as a basis for recovery for two reasons: first, because as a matter of law Barclays had no duty to disclose the notional amount of monoline exposure; and second, because Barclays demonstrated that the omission did not cause Askelson's subsequent losses. As set forth below, we disagree with the District Court's first conclusion, but identify no error in its dispositive analysis of the second: Barclays' conclusive proof regarding negative loss causation.

In holding that, as a matter of law, Barclays bore no duty to disclose the notional amount of its monoline exposure, the District Court relied on our recent decision in *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383 (2d Cir. 2015) ("*RBS*"). In *RBS*, we affirmed a district court's Rule 12(b)(6) dismissal of a complaint alleging securities fraud under section 10(b) of the Securities Exchange Act, where plaintiffs alleged (among other theories of recovery) that RBS had wrongfully "failed to disclose $6.8 billion in subprime exposures and $14.1 billion in exposure to monoline insurers." *Id.* at 390. While our discussion there focused on materiality, we observed an additional shortcoming of plaintiffs' complaint: they "fail[ed] to explain how the $14.1 billion [in exposure to] monoline insurers constitute subprime exposures or that RBS had an obligation to disclose them as U.S. subprime exposures 'net of hedges.'" *Id.* at 391–92.

This observation should not be read to set forth a categorical rule that an issuer will *never* have a duty under section 11 to disclose the notional amount of its exposure to

8

monoline insurers. Instead, the statement has a much narrower import: in the context of a motion to dismiss an action brought under section 10(b), we found wanting plaintiffs' pleadings in support of the claimed inference that RBS had any obligation to report its exposures to monoline insurers under the broader rubric of "Total U.S. subprime exposures." *Id.* This was a ruling heavily limited by context. Rather than relying on fixed rules as to which categories of information are subject to disclosure under section 11, courts must consider each claim on a case-by-case basis and determine whether, in the totality of the circumstances, the allegedly omitted disclosure was "necessary to prevent existing disclosures from being misleading." *Hutchison*, 647 F.3d at 484; *see also Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth."); *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[T]he lack of an independent duty is not . . . a defense to . . . liability because upon choosing to speak, one must speak truthfully about material issues.").

We need not pursue the issue further in this case, in any event, because, whether or not Barclays might have had such a duty here, we agree with the District Court that Barclays resoundingly established its affirmative defense of negative loss causation as to this theory of liability, entitling it to summary judgment in its favor.

In support of its negative loss causation defense, Barclays relied on the analysis of its expert, Dr. Allan W. Kleidon.[5] Dr. Kleidon conducted an "event study" with respect to the price of Barclays' Series 5 ADS shares during the period between April 8, 2008, and March 24, 2009. An event study is an empirical statistical analysis by which experts may "disentangle[] the effects of two types of information on stock prices—information that is

---

[5] On appeal, Askelson challenges the District Court's denial of his motion under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), to exclude Dr. Kleidon's expert report. In the alternative, he contends that the District Court erred by relying on Dr. Kleidon's report in granting summary judgment. We review for abuse of discretion a district court's determination to admit expert testimony. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 264 (2d Cir. 2002). Substantially for the reasons stated by the District Court in its summary judgment opinion, *see In re Barclays Bank PLC Sec. Litig.*, No. 09-CV-1989 (PAC), 2017 WL 4082305, at *21–25 (S.D.N.Y. Sept. 13, 2017), we conclude that Dr. Kleidon's report and event study are based on "reliable principles and methods" and would "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. We therefore rule that the District Court did not err by admitting Dr. Kleidon's report and relying on it, in part, in its award of summary judgment.

9

specific to the firm under question . . . and information that is likely to affect stock prices marketwide." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016) (quoting Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities & Exchange Commission*, 49 Bus. Law. 545, 556–57 (1994)). Such a study allows an expert "to make inferences about the degree to which the company's stock price may have been artificially inflated on the basis of the market's misconception as to the truth prior to the release of that information." *Id.* at 253–54. In his event study, after controlling for market and industry effects, Dr. Kleidon calculated Barclays' "residual returns"—changes in stock price that *cannot* be explained by general market forces—and opined as follows about their statistical significance at a 95% confidence interval.

On August 7, 2008, Barclays issued a Form 6-K announcing its interim results for the period ending June 30, 2008. In its Form 6-K, Barclays disclosed all the information that Askelson contends was wrongfully omitted from its March 26, 2008 Form 20-F, including the notional amount of its exposure to monoline insurers, disaggregated by type of asset and credit rating of the monoline insurers in question, as of both December 31, 2007, and June 30, 2008. The Form 6-K disclosure revealed that Barclays' net current exposure to monolines almost doubled between those dates, growing from £1,335 million on December 31, 2007, to £2,584 million on June 30, 2008, largely because (as the Form reflects) of a corresponding decline in the fair value of the underlying assets.

After the release of its Form 6-K, which thus remedied the charged omission, the share price of the Series 5 ADS shares decreased marginally, falling from $24.69 on August 6, 2008, to $24.46 on August 7, 2008, marking a loss of $0.23 per share. According to Dr. Kleidon, the related residual return had no statistical significance. Indeed, even a layperson's review of the Series 5 ADS share prices during the three weeks following the disclosure reveals no significant movements in response to the remedial disclosure, and only minor variations in share value above $24.00. Indeed, on one day during this period, the share price actually *exceeded* the pre-disclosure price.

The same minor fluctuations are reflected in the residual returns calculated by Dr. Kleidon for the relevant period. Thus, simply put, the evidence shows virtually no market

reaction—and certainly no statistically significant market reaction—to the revelation of over £21 billion of what Askelson characterizes as "hidden" assets.

Askelson does not rebut Dr. Kleidon's analysis. Rather, he tries to explain this apparent lack of market reaction by responding that the August 7, 2008 disclosure was not "fully corrective" of the charged omissions because it "did not reveal that the monolines had insured *previously undisclosed* credit-market assets that *were in addition to*—and therefore omitted from—the £37.8 billion credit-market positions represented in the Offering Materials." App't Br. 68. In other words, Askelson contends that a reasonable investor might believe that, instead of providing further information about the assets underlying Barclays' £1,335 million net current exposure to monoline insurers (as of December 31, 2007), the £21 billion in notional assets identified in the Form 6-K could refer to some other portion of the assets already disclosed in the Form 20-F. We do not think that an investor could reasonably draw this conclusion.

The August 2008 Form 6-K includes a chart of Barclays Capital's estimates of its credit market exposure as of three dates: June 30, 2007, December 31, 2007, and June 30, 2008. The Form 6-K chart provides only one line reporting the three values for Barclays' then-current exposure to the monolines. It shows that, as of December 31, 2007, that amount was £1,335 million—the same figure provided as of that date in the "Barclays Capital credit market position" chart that appears in the Form 20-F issued in March 2008. Supp. App'x 4634. The Form 6-K chart then points the reader to note "D," which is an explanatory note explicitly associated with the "monoline insurers" line on the chart. *Id.* Note D, in turn, identifies the same net exposure (£1,335 million) as shown in both the primary chart and the March 2008 Form 20-F. Note D next provides both the notional and fair values of the assets that underlay the calculated £1,335 million net exposure—information that was *not* previously disclosed in the Form 20-F. *Id.* at 4638. Indeed, that detailed information is precisely what Askelson alleges was earlier "hidden" from the market.

The structure of the August 2008 Form 6-K—that is, an informational chart accompanied by detailed explanatory notes—demonstrates that Barclay's disclosure of notional amounts in Note D was intended to (and did) provide further disaggregation related

to information shown on the "monoline insurers" line on the chart; it did not refer to data on other lines on the chart or to assets not represented in the chart at all. Because the value of the "monoline insurers" line (as of December 31, 2007) is identical in both the March 2008 Form 20-F and the August 2008 Form 6-K, Barclays' additional disaggregation in Note D unmistakably referred to this line *only*. Since Barclays provided no such disaggregation in its earlier-issued Form 20-F, any reasonable investor would conclude that the notional amounts reported in the Form 6-K were "in addition to . . . the credit-market positions represented in the Offering Materials," contrary to Askelson's assertion. App't Br. 68.

Our conclusion that the August 7, 2008 Form 6-K disclosure was fully corrective as to Askelson's monoline insurer non-disclosure theory means that we need not consider whether additional allegedly corrective information may have emerged at any later date. Nor need we determine the adequacy of Dr. Kleidon's event study for other dates after August 7, 2008, but before March 24, 2009, when Barclays released its Form 20-F for fiscal year 2008. *See Akerman,* 810 F.2d at 343 (affirming grant of summary judgment where defendants, by means of statistical evidence "met their burden . . . by establishing that the misstatement was barely material and that the public failed to react adversely to its disclosure"). On *de novo* review, we conclude as a matter of law that, on this record, Barclays has satisfied its negative causation burden regarding this theory of section 11 liability.[6]

### III.

Askelson's second main theory on appeal relates to a purported "mandate" or "directive" issued by the Financial Services Authority ("FSA")—the United Kingdom regulatory body tasked at the time with regulating financial services markets—to Barclays to

---

[6] To the extent that Askelson contends that, at the time of the April 2008 Offering, the £1,335 million figure for Barclays' exposure to the monolines was "stale" and therefore misleading, App't Br. 20, Barclays has established its negative loss causation defense as to this theory as well. On May 15, 2008, Barclays released a Form 6-K disclosing its interim results for the first quarter of 2008, with figures as of March 31, 2008—only a week before the offering. The May issuance showed that Barclays' exposure to monoline insurers more than doubled to £2,784 million, and in it Barclays stated that this doubling occurred because "[a]s the value of the underlying assets fell, the market value of the contracts, and hence Barclays Capital exposure, rose." Supp. App'x 1933. On the day of this disclosure, the price of the Series 5 ADS shares *rose* by $0.06, from $25.17 on May 14, 2008, to $25.23 on May 15, 2008.

maintain a "Tier 1 Equity Ratio" of over 5.25%.[7] The factual predicate for this theory lies largely in two meetings, both held on or around March 8, 2008, between the FSA's then-Chariman Callum McCarthy and Barclays Chairman Marcus Agius. Agius's notes on these meetings were circulated to Barclays' Board of Directors and were part of the summary judgment record.

The notes reflect Agius's impression that the FSA Chairman "want[ed] to be clear as to [Barclays'] contingency plans for raising new equity capital should there be a further precipitate fall in asset values." Supp. App'x 228, ¶ 348. McCarthy "expressed particular concern that our Tier 1 equity ratio is only 4.6 per cent (as compared to our own figure of 5 percent) and, he believes, is only forecast to be at or above our target of 5.25 per cent in 2 of the next 24 months." *Id.* Agius's notes describe the FSA Chairman as using a "sharp" tone, and record that he referred to Barclays' equity ratio as "alarming" and stated that he needed to know "as a matter of urgency" what Barclays' contingency plans were, so that the FSA could determine whether it "would need to take any action." *Id.*

Very shortly after these meetings, Barclays revised its short-term capital plan for 2008. In it, Barclays downgraded its projected Tier 1 Equity ratio for June 2008 from 4.89% to 4.53%, citing "adverse capital movements." Supp. App'x 3151–52. The new capital plan left no doubt that Barclays needed either to reduce its risk-weighted assets or increase equity in the near future. It identified increasing the size of the planned April 2008 share offering as one potential means of doing so.

Barclays provided its revised short-term capital plan to the FSA on March 14, 2008. Thereafter, in a March 20, 2008 meeting of Barclays' Board of Directors, Barclays' Group Finance Director Christopher Lucas explained that "[t]he indications were that the FSA would wish [Barclays] to achieve its own target equity ratio [of 5.25%] before the end of

---

[7] A bank's Tier 1 Equity ratio is calculated by dividing stockholders' equity by the value of a bank's risk-weighted assets. Supp. App'x 3763–64. Risk weights are determined by asset class, as well as the credit rating of a given security within the asset class. *Id.* at 3763. The riskier the asset, the higher the risk-weight that is assigned it—consequently, in riskier environments, the valuation of risk-weighted assets tends to rise, therefore causing the Tier 1 Equity ratio to fall. *Id.* at 3764.

2008." Supp. App'x 2860. Lucas accordingly presented various possible means of raising equity and reducing risk-weighted assets. Also on March 20, Barclays' CEO John Varley prepared a note for Agius to transmit to Chairman McCarthy, referencing Barclays' "proposals as to our capital plan that are directed at addressing your concerns." *Id.* at 3230.

We agree with the District Court that this record presents no genuine dispute of material fact as to the existence of a purported FSA "mandate" or "directive." The parties agree that, at the relevant time, the United Kingdom's regulatory minimum Tier 1 Equity ratio was 2%, and that Barclays' ratio was well above this minimum. There is no document or communication in the record that suggests that the FSA took *any* formal regulatory action to require Barclays to meet a different standard or that Barclays undertook a formal commitment to do so—much less that the FSA imposed an ongoing mandate that would bind Barclays through 2009. No fact-finder could reasonably construe a regulator's expressions of concerns about a bank's financial status and vigorous requests—even if expressed urgently—to be kept apprised of the bank's contingency plans as a regulatory "directive" or "mandate" with the force of law. *Cf. In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 541–42 (S.D.N.Y. 2015) (collecting cases from pharmaceutical industry and noting that "interim [agency] feedback is not material because it does not reflect a binding agency decision and is subject to change"). Like the District Court, we are persuaded that Barclays had no legal duty to disclose the substance of its March 2008 conversations with the FSA in the Offering Materials.

Finally, Askelson contends that the Offering Materials wrongfully failed to disclose a material decline in Barclays' capital ratios during the first quarter of 2008. He focuses on a decrease of the Tier 1 Equity ratio from 5.1% to 4.34% between December 31, 2007, and the April 2008 Offering. As with his theory relating to Barclays' exposure to the monolines, however, we need not decide whether Barclays had any duty to disclose such information or whether the information was material because Barclays has established negative loss causation as a matter of law.

On June 25, 2008, approximately ten weeks after the Offering, Barclays disclosed an additional £4.5 billion capital raise, which increased its Tier 1 capital and equity ratios as of

14

June 30, 2008, to 7.9% and 5.0%, respectively. These ratios were roughly equivalent to those previously reported to investors as of December 31, 2007: those were 7.6% and 5.1%, respectively. Upon the June 25 announcement, the price of Barclays' Series 5 ADS shares rose by $0.16, from $24.80 on June 24, 2008, to $24.96 on June 25, 2008. Dr. Kleidon opined that this price movement was associated with a statistically insignificant residual return.

The June 25 disclosure broke any chain of causation that might have existed connecting any failure to report declining capital ratios in the months between December 2007 and April 2008, and any losses Askelson may have suffered after June 25, 2008. After the capital raise and updated capital and equity ratios were disclosed in June 2008, investors could not have been prejudiced by any omission between December 2007 and the Offering in April 2008 to publish declining ratios, and there is no record evidence of any statistically significant losses in the price of Series 5 ADS shares occurring in or about June 2008—dramatic losses would come only later, in and after Fall 2008.

Askelson's only rejoinder to this observation is (as before) that the capital raise and the revelation of new capital ratios in June were not "fully corrective" of the charged omissions because the FSA's "directive" still hung like an albatross around Barclays' neck, requiring it to undertake yet further capital raises so as to maintain the purportedly mandatory 5.25% Tier 1 Equity ratio. App't Br. 65–66. For the reasons stated above, however, we conclude that Askelson has not raised a genuine dispute of material fact as to the existence of any FSA "directive," and therefore this argument fails. In other words, absent an undisclosed regulatory mandate requiring Barclays to continue to raise more equity, the June 25, 2008 disclosure of an additional capital raise was fully corrective. Accordingly, because Barclays has conclusively proven that "the subject of the . . . misstatements and omissions was not the cause of [any] actual loss suffered," *Nomura*, 873 F.3d at 154 (internal quotation marks omitted), we affirm the District Court's grant of summary judgment to Barclays on Askelson's "material decline in capital ratios" theory as well.

*     *     *

15

We have considered Askelson's remaining arguments and conclude that they are without merit. For the reasons set forth above, we decide that Barclays has established that none of Askelson's claims to recovery under section 11 based on the omissions that he alleges to be wrongful survives summary judgment, either because Barclays had no duty to disclose the information Askelson specifies or because Barclays established that the failure to disclose did not cause him to suffer any loss. We therefore affirm the District Court's grant of Barclays' motion for summary judgment on Askelson's claims under section 11 of the Securities Act.

Because we rule that Askelson's section 11 claims against Barclays fail, we also affirm the District Court's grant of summary judgment on Askelson's parallel section 11 claims as to the Underwriters and its grant of summary judgment on Askelson's section 15 "control person liability" claims against the individual defendants associated with Barclays. *See Hutchison,* 647 F.3d at 490 ("To establish [section] 15 liability, a plaintiff must show a 'primary violation' of [section] 11 . . . .").

The District Court's judgment is **AFFIRMED**.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

16